On the 28th of December, 1845, one Vigil and certain other persons addressed a petition to the Most Excellent Departmental Assembly, through Armijo, governor of New Mexico, asking for a grant of a tract of laud called the
 
 Jornada del Muerto,
 
 binding themselves, if the grant were made, to construct two wells for the relief and aid of travellers, and establish two factories for the use of the State, and to protect them from hostile invasion. The governor transmitted
 
 *451
 
 laws in force in the Territories of Mexico for the disposition of the public lands, with the exception of those relating to missions and towns, are the act of the Mexican Congress of 1824, and the regulations of 1828. The avowed purpose of the Congress in enacting this law, and of the supreme government in carrying it into effect, was to colonize the public domain; to preserve it for settlement or cultivation. The favor of the legislature has, doubtless, been often abused by unworthy ministers in charge of the remote Territories, but this consideration in no wise detracts from the wisdom of the policy on this subject. This policy recognized the obligation resting on the government to hold the public lands as a public trust, to be administered for the benefit of those who would settle upon them or cultivate them. They could not be sold for money, nor granted away in consideration of past public services, nor on condition of making public improvements, of use to the travelling community, or of general benefit to the state. The power to cede them depended entirely on the uses to which they were to be put, and these, as we have seen, were cultivation or settlement. The legal right to dispose of them for other objects, was withdrawn from the local authorities, and rested alone with the supreme government.
 

 If the policy of the law were wise, so were the regulations established for the purpose of carrying out its provisions. These regulations conferred on the governors of the Territories, “the political chiefs,” as they are called, the authority to grant vacant lands, and did not delegate it to the Departmental Assembly. It is true the grant was not complete until the approval of the Assembly, and in this sense the Assembly and governor acted concurrently, but the initiative must be taken by the governor. He was required to act in the first instance—to decide whether the petitioner was a fit person to receive the grant, and whether the land itself could be granted without prejudice to the public or individuals. In case the information was satisfactory on these points, he was authorized to make the grant, and at the proper time to lay it before the Assembly, who were
 
 *452
 
 required to give or withhold their consent. They were in this respect an advisory body to the governor, and sustained the same relation to him, that the Senate of the United States does to the President in the matter of appointments and treaties. The Mexican government chose-to intrust to an officer appointed by it, the execution of its policy on the subject of the public domain, rather than to an elective assembly, over whose conduct it could not in the nature of things exercise the same supervision and control, [t would seem,'owing to the remoteness, of the Territories from the seat of the General government, and the sparseness of the population, that the . wisdom of the selection could not be disputed, but be this as it may, it was the undoubted right of the Mexican government to- decide the question for itself, and this court cannot be required to go' further than.to give effect to that decision.
 

 These views'dispose of this casé, for the grant in controversy was the sole act of the Assembly, and has not even the element of the governor’s recommendation in its favor.
 

 But if it were otherwise, and the cession were the act of the governor, it would still be invalid, because it would violate the fundamental rule on which the right of donation was placed by the. law. The essential element of colonization is wanting, and, besides, the number of acres granted was enormously in excess of the maximum quantity grant-able under the law. The decrees of the Cortes of Spain are invoked as an authority for this grant, but it is sufficient to say, that they were invoked for a similar purpose in Vallejo’s case,
 
 *
 
 and were decided'to be inapplicable to the state of things existing in Mexico after the revolution of 1820. Ana the organic bases of the Mexican republic of June 18th, 1843, are equally ineffectual to support this grant. If it be conceded the powers of the Departmental Assembly were enlarged by these decrees, so far as the private property belonging to the department, as a municipal organization, is
 
 *453
 
 concerned, yet they effected no change in the mode of disposing of the public lands, nor was the colonization policy of 1824, at all altered by them, for they expressly declare that “in alienations of lands, the existing laws will be observed and what the colonization laws determine.”
 

 In any aspect of this case, the claim for this large tract of land has no foundation to rest upon. The Departmental Assembly, aided in a certain sense by the governor, usurped the prerogative of the supreme government, and no ingenuity of reasoning can sanction a proceeding, which was not only without authority of law, but contrary to the forms prescribed by it.
 

 Judgment reversed, and the cause remanded to the court below, with directions to enter a decree
 

 Dismissing the petition.
 

 *
 

 1 Black, 541.