THE PEOPLE, RESPONDENT, *v.* THE MUNICIPALITY OF SAN JUAN, APPELLANT.

APPEAL from the District Court of San Juan, Section 1.

No. 886.—Decided June 6, 1913.

PUBLIC LANDS—TREATY OF PARIS.—In accordance with article 8 of the Treaty of Paris, the ownership of all lands which belonged to the Crown of Spain and had not been disposed of lawfully on December 10, 1898, when the said treaty was signed, passed to the United States of America.

ID.—POLICY OF CONGRESS.—In accordance with the policy followed by the United States Congress in regard to public property acquired by the American nation from the Spanish nation in the Island of Porto Rico, all the lands so acquired which from their character do not correspond to national ownership or have not been reserved expressly for national purposes, have passed to the ownership of The People of Porto Rico.

ID.—POWER TO CEDE PUBLIC LANDS.—Neither the Constitution Establishing Autonomy in Porto Rico, of November 25, 1897, nor the former laws empowered the Governor of Porto Rico under Spanish sovereignty to grant of his own accord lands reserved by the National Government for any of its departments. Concessions and sales of public lands in Porto Rico were effected in accordance with the provisions of duly enacted laws or were authorized by royal orders.

ID.—POWERS OF GOVERNOR—SPANISH-AMERICAN WAR.—The Spanish-American war did not vest extraordinary powers in the Governor of Porto Rico to cede to the municipality of San Juan national lands when such cession was not incident to the war nor necessary for its prosecution.

ID.—OWNERSHIP—PRESCRIPTION.—Since the establishment of American sovereignty, ownership of national or insular lands cannot be acquired by prescription.

ID.—ACTION OF EJECTMENT—WAIVER OF RIGHT.—The fact that the Governor of Porto Rico authorized the creation of a mortgage on property belonging to the municipaliiy to secure a debt and that the representative of the United States Navy Department initiated certain negotiations for the purchase of said lands which did not materialize, did not constitute a bar to the right of the lawful owner of said lands to bring an action of ejectment. Neither the Governor of Porto Rico nor the United·States Navy Department has the power, without special authorization, to waive rights corresponding to the Legislature of Porto Rico or to the United States Congress.

ID.—BUILDING ON LAND OF ANOTHER IN GOOD FAITH.—The circumstances of the case show that the building was erected by the defendant municipality in good faith on the lot in litigation; therefore the provisions of section 370 of the Revised Civil Code are applicable.

The facts are stated in the opinion.

*Mr. Wolcott H. Pitkin, Jr.,* Attorney General, and *Messrs. Charles E. Foote* and *Salvador Mestre, fiscals,* for The People.

*Messrs. Ramón Falcón* and *Adrián Agosto* for appellant.

MR. JUSTICE DEL TORO delivered the opinion of the court.

This is an action to establish the ownership of a piece of land and a building erected thereon. Both The People of Porto Rico and the municipality of San Juan allege that they are the owners of the said property. The controversy was decided by the District Court of San Juan, Section 1, in favor of The People, from which decision the municipality took the present appeal.

The demolition of the fortifications in the eastern part of the city of San Juan is a historical fact.

"Long and persistent have been the efforts to bring about this reform, the first step towards the accomplishment of which was taken when General Primo de Rivero ordered the throwing open of the San Rafael gate in 1873 and the second when General Antonio Dabán tore down the San Justo gate in 1894, changing the ancient appearance of the entrance to the city from the bay. Finally, an order was issued by the War Department and executed by General Marín on May 18, 1897, by demolishing the Santiago ravelin and all the line of bastions from. Fort San Cristóbal to San Juan gate." History of Porto Rico by Salvador Brau, published by D. Appleton & Co., p. 291.

We have begun by referring to the tearing down of the fortifications on the eastern limits of the city of San Juan, because with this as a starting point it will be better understood how the facts developed which gave rise to the grant of the lands and the building in question in this suit to the municipality of San Juan by the Governor of Porto Rico.

On July 26, 1897, the city council of San Juan was informed by its president of a conference which he had had with the Governor-General of the Island. In said conference the Governor stated that the pavilion being occupied temporarily by the police corps was not included in the order for the demolition of the fortifications, but that he would allow it to be torn down along with them on the condition that the municipality would construct a building for police barracks and annex thereto a pavilion for the use of the commanding officer of the post. Besides, the Governor promised to use his influence to obtain for the municipality a free grant of the old customhouse with all its equipment and the land it occupied as well as the lot or lots necessary for the location of the building to be erected by the city council for the purpose stated.

The report concluded as follows:

"Therefore, it is understood by the president that the matter should be referred to the architect for his report with an estimate of the cost of the constructions asked for by His Excellency as compared with the benefits to accrue to the city by the removal of such obstructions * * *. There is no doubt that if the municipality carries this undertaking to a conclusion, Dabán Avenue will be completed, beautifying all those surroundings, and that the municipality will receive the congratulations of the neighborhood."

The architect drew up plans of the works and estimated the cost at 17,938 *pesos* and 40 *centavos*. The municipality then decided to submit the same to the proper authority and, if approved, to obligate itself to construct the said building to be used as police barracks, the municipality receiving besides the old custom-house and the pavilions to the east of the

theater and the Plaza Colón.   This resolution was passed at the session of September 10, 1897.

The Governor approved the plans with slight modifications and communicated that fact to the mayor on October 7, 1897. The modifications were accepted by the council.

On October 20, 1897, Ramón Poveda, reviewing officer of the post (*comisario de guerra*), representing the administrative department of the army; Armando Morales, chief of military works, in representation of the army engineer corps, and Arturo Guerra, municipal architect, in the name of the city council, assembled at the command of the Captain-General to "designate and mark the boundaries of a plot of ground from the lands reserved for the War Department lying on the north of the lands of the eastern extension of this city, said lot to be used for the building of a police barracks and to be conveyed to the city council for that purpose only, after which the property is to revert to the War Department." At the said meeting the lot was selected and the boundaries duly determined.   The lot measured 35 meters on the front by 44 meters in depth.   The foregoing is shown in the proceedings of the meeting on pages 9 and 10 of the transcript thereof and the same was approved by the city council at its session of October 28, 1897.

On August 22, 1898, or nearly a year thereafter, the mayor of San Juan forwarded to the Governor of the Island a resolution of the city council asking "permission to transfer the inmates of the municipal asylum to the building which the said corporation is erecting for a police barracks in Puerta de Tierra ward of the capital, and that inasmuch as by reason of the present conditions the building will not be needed for the purpose for which it was intended, it be granted the fee title to the building and the land whereon the same is being erected."   After considering the request of the council the Governor ordered that the grant be made in the regular manner, and notice of his decision was communicated by B. Francia

to the mayor of San Juan. Formal delivery was made on September 9, 1898.

At a special session of the city council held on September 10, 1898, an official communication from the Governor-General dated September 3, relating to the grant to the municipality of the building constructed for a police barracks and of the lot on which it is erected to be used as a municipal charity asylum, was read, and it was resolved to extend "an earnest vote of thanks to the Executive of the Island for such a valuable concession," resolving, also, to request the grant of two adjoining pieces of land, one of 65 x 55 meters and the other 35 x 11 meters.

On September 17, 1898, Captain-General M. Macías notified the mayor that in view of the resolution of the municipal corporation petitioning for the grant of the other two parcels of land he "had decided to accede to the petition of the said corporation and had ordered that the said grant be made on the same day in the customary manner." On September 21 a formal delivery was made of the two new parcels of land granted.

The lands so granted to the municipality were recorded in the registry of property in its name and later they were mortgaged several times to secure debts contracted by the municipality. The execution of certain of the said mortgages by the municipal corporation was authorized by the Acting Governor, W. H. Hunt. The mortgages had been canceled at the time of the filing of this suit. It appears also that the Navy Department of the United States sought to purchase the lands in question from the municipality but without definite result.

Having stated the foregoing facts, the correctness of which is shown by the evidence contained in the transcript of the record submitted to this court, let us see whether or not the plaintiff has established its right of ownership to the lands and building granted to the defendant in the manner set forth and now in the possession of the latter. We will first con-

sider the matter of the ownership of the lands and afterwards that of the building.

It is beyond question that the lands in controversy were a part of the War Department reservation of the Spanish nation and that they were not included in the lands intended for the extension of the city of San Juan. For the sake of greater clearness, we should state that in the same Royal Order of April, 1897, which authorized the demolition of the fortifications of the eastern part of the city, a plan for the extension of the city of San Juan towards the east was drawn up and approved. It was decided, also, to sell lands reserved to the War Department situated in the Marina ward of the city. All of the said lands were to be delivered to the Treasury Department for sale and the proceeds of the sale deposited in the Treasury to be applied exclusively to the fortifications and buildings of the War Department.

When the American sovereignty supplanted the Spanish sovereignty in the Island of Porto Rico the plan of extension had not been carried out.

Therefore, if the lands in question which belonged to the Crown of Spain had not been disposed of lawfully on December 10, 1898, when the Treaty of Paris was signed, it is unquestionable that in accordance with Article VIII of said treaty the ownership thereof passed to the United States of America.

The policy followed by the United States Congress in regard to public property acquired by the United States from Spain in the Island of Porto Rico has been to cede to the Island all of said property except such as by reason of its character corresponds to national ownership, and that expressly reserved for national purposes. The lands which form the subject-matter of this action are not included in either the one or the other. Therefore, if the United States acquired any title thereto, said title passed to The People of Porto Rico. See section 13 of the Organic Act of Porto Rico; Acts of the United States of July 1, 1902, 32 Stat. L., 731; of

March 4, 1907, 34 Stat. L., 1410, and of June 14, 1910, 36 Stat. L., 467; Acts of Porto Rico of February 16, 1903, Acts of 1903, p. 112, and of March 14, 1907, Acts of 1907, p. 317; Proclamations of the President of the United States of March 29, 1899, 1 Comp. of Acts, etc., relating to Noncontiguous Territory, 391; of January 17, 1903, vol. 1, p. 400, *id.;* of June 26, 1903, vol. 2, p. 279, *id.;* of June 30, 1903, vol. 2, p. 281, *id.;* of August 4, 1908, vol. 4, p. 605, *id.;* and of January 26 and July 13, 1912, vol. 4, No. 4 of the *Official Gazette,* p. 383, and section 5 of the Political Code.

The foregoing conclusions having been established, we should consider and decide what we regard as the conclusive issue in this suit, namely, whether or not the Governor of Porto Rico was empowered to make grants of the lands reserved to the War Department of Spain to the municipality of San Juan.

The first grant—that is, of the lot measuring 35 meters front by 44 meters in depth on which the building was erected—was made on the 3d or 7th of September, 1898, and the second, of the pieces of land 65 meters front by 55 meters in depth and 35 meters long by 11 meters wide, on September 17, 1898.

In the month of September, 1898, the Royal Decree of November 25, 1897, relative to the Constitution establishing self-government in the Island, was in force. Volume 62 of the *Colección Legislativa* of Spain, p. 508 *et seq.* By article 2 of the said royal decree the Governor-General was the representative of the mother country in whose name he exercised supreme authority. As such and as viceroyal patron (article 41) he was vested with the powers inherent in the patronate of the Indies; he had command of all military and naval forces in the Island; he acted as delegate of the Departments of State, War, Navy and the Colonies; all other authorities in the Island were subordinate to him, and he was responsible

for the preservation of order and the safety of the colony. Article 42 of the said royal decree reads:

"The Governor-General, representing the Nation, will discharge by himself and with the aid of his secretaries all the functions indicated in the preceding articles and such others as may devolve upon him as direct delegate of the King in matters of a national character."

Continuing, the same article specifies what authority shall be vested in the Governor as representative of the home government.

Article 43 of said royal decree specifies the powers vested in the Governor as the superior authority of the colony and head of its administration. When acting in this capacity his orders (article 44) were required to be countersigned by a secretary of the cabinet, who thereby rendered himself responsible for the same.

This aspect of the question has no importance because the act performed by the Governor was not one of colonial administration, but of national administration. The property granted did not belong to the colony, but to the nation.

We have considered carefully not only the provisions cited, but the decree establishing self-government, in their entirety, and can find nothing therein which empowers the Governor, of his own accord, to grant lands reserved by the National Government for any of its departments. Neither does an examination of the laws preceding this royal decree show any precedent which could serve as a ground for the exercise of such authority. On the contrary, all the precedents show that concessions to and sales of public lands in Porto Rico were effected in accordance with the provisions of duly enacted laws or were authorized by orders emanating from the Crown. Conspicuous examples of the latter may be found in the Royal Order for the alienation of State properties of January 24, 1857, 9 San Pedro, *Legislación Ultramarina,* 440; the Royal Order for the alienation or transfer of certain lots situated in the Marina ward of the capital of Porto Rico of April 25, 1887,

10 San Pedro, *Legislación Ultramarina,* 750; and the same Royal Order relating to the demolition of the fortifications of the eastern limits and the extension of the city of San Juan. For a general study of the subject volume 4, pages 666 to 689 of the *Legislación Ultramarina* may be consulted.

This being the case and the grants in question not having been effected in accordance with any general law or in fulfilment of any special order, and the Governor having no authority to make the grants on his own prerogative, said grants must be held to be null and void, and hence, as the ownership of the lands could not be conveyed to the municipality by said grants, it remained in the Spanish nation and was transferred by the same to the United States and by the latter to The People of Porto Rico in the manner stated.

In the case of *Mumford* v. *Wardwell,* 6 Wall., 435, the Supreme Court of the United States expressed itself as follows:

"Mexican rule came to an end in that department on the 7th of July, 1846, when the government of the same passed into the control of our military authorities. Municipal authority also was exercised for a time by subordinate officers appointed by our military commanders. Such commander was called military governor, and for a time he claimed to exercise the same civil power as that previously vested in the Mexican governor of the department. By virtue of that supposed authority, General S. N. Kearney, March 10th, 1847, as military governor of the Territory, granted to the town of San Francisco all the right, title and interest of the United States to the beach and water-lots on the east front of the town, included between certain described points, excepting such lots as might be selected for government use.

\*      \*      \*      \*      \*      \*      \*

"But the power to grant lands or confirm titles was never vested in our military governors; and it follows as a necessary consequence that the grant as originally made was void and of no effect. Nothing passed to the town by the grant, and, of course, the doings of the *alcalde* in selling the lot in question was a mere nullity."

See also the case of the *United States* v. *Vigil,* decided by the same court and reported in 13 Wall., 449, wherein it was

held that a certain grant of lands by a departmental assembly of Mexico was void because the said assembly had no authority to dispose of property of the public domain.

We have consulted many of the cases relating to Mexican grants decided by the Supreme Court of California and by the Supreme Court of the United States and we are of the opinion that they are not applicable to the case at bar. In the cases of Mexico the governors or political heads of the departments were expressly authorized to grant the unappropriated lands in their respective districts by the Regulations for the Colonization of the Departments of the Republic of November 21, 1828. 10 Cal., 636.

We have also examined the case of *Jover* v. *Insular Government*, 221 U. S., 623, where the Supreme Court of the United States held that a grant of certain public lands bathed by the sea, made by the Governor of the Philippine Islands in the year 1859, was valid, and we consider this also not applicable to the case at bar, because in 1898 the Governor of Porto Rico was not vested with the same extraordinary powers as was the Governor of the Philippine Islands in 1859.

On April 25, 1898, the United States Congress declared that war existed between the United States and Spain. On July 25, 1898, the United States army landed in Porto Rico. On August 12, 1898, a protocol of peace was signed suspending hostilities and on December 10, 1898, as we have stated, the Treaty of Paris was signed. The existence of the war is referred to by both parties to this suit as tending to prove different facts. By the defendant, as a ground for the allegation that the Governor-General of Porto Rico possessed extraordinary powers, among which was that of disposing of lands belonging to the National Government, and by the plaintiff, to demonstrate the existence of bad faith on the part of the Governor who, knowing that the Spanish sovereignty was about to cease forever in Porto Rico, sought to deprive the new Government of the ownership of the lands in question.

In our opinion neither of the contentions is justified; that

of the defendant is not because the grants were not made on account of the war nor were they necessary for the ends thereof; besides, they were made after the cessation of hostilities between Spain and the United States, the last grant having been made on September 17, 1898, after the enactment of the law of September 16, 1898, authorizing the Government to relinquish the rights of sovereignty and cede territory in the provinces and colonial possessions in accordance with the preliminary terms of peace agreed upon with the United States. *Colección Legislativa de España* (1898), vol. 2, p. 273. Neither can the allegation of the plaintiff be sustained because there is nothing in this case to show bad faith either on the part of the Governor or of the municipality, but rather the desire to dedicate a portion of the national lands situated outside of the fortifications and at the extremity of the lands to be utilized for the extension of the city to an institution supported by a public corporation for the benefit of the public.

It is alleged by the defendant that even though the Governor had no power to make the grants, the municipality has acquired the ownership of the lands by prescription. The grants were made in 1898 and in that same year Spanish sovereignty ceased in Porto Rico. It is evident that when the new sovereignty took charge the defendant had acquired no right by prescription, and under the new sovereignty acquisition of ownership by prescription was not authorized either against the United States or against The People of Porto Rico. See *The People* v. *Dimas,* 18 P. R. R., 1019 *et seq.,* where this question is treated extensively.

The facts that the United States Navy Department through its representative in Porto Rico initiated certain negotiations for the purchase of said lands which did not materialize, and that the Governor of Porto Rico authorized the mortgaging thereof to secure a debt of the city council, do not constitute a bar to the right of the plaintiff to bring this action. The municipality was in possession of the property apparently under a good title, and it is but natural that it was considered

and treated with as the lawful owner. But this cannot be deemed sufficient to prevent the lawful owner from bringing an action to recover the property if on investigation it appears that the grants were made by the Governor without legal authority. Moreover, even though the United States Navy Department or the Governor of Porto Rico had expressly acknowledged the defendant to be the owner of the property, this would not prevent the United States or Porto Rico from pursuing their rights if they had any, because neither a department of the National Government nor the Governor of Porto Rico acting as such without any special authorization is empowered to waive rights which correspond to the United States Congress or to the Legislative Assembly of Porto Rico, as the case may be.

Hence, in deciding the present action according to law the judgment appealed from should be affirmed in so far as regards the recovery of the lands granted by the Governor-General of Porto Rico to the municipality of San Juan.

We will now consider and decide the controversy regarding the building. From the facts previously stated it appears that the city council of San Juan agreed to construct a police barracks and deliver the same to the Insular Government on condition that the latter raze both the fortifications and the pavilion temporarily occupied by the said police corps and gratuitously cede to the municipality the old custom-house and lot on which it stands. It further appears that the barracks had not been completed when together with the land it was conveyed by the Governor to the municipality, and that the said building was erected at the cost of the latter.

Such being the case, and as it has not been alleged in the complaint nor shown by the evidence that the old pavilion used by the police had been torn down or that the old custom-house and lot had been conveyed to the municipality, and the conclusion having been reached that the Governor lacked authority to determine this matter alone and that he as well as the council acted in good faith, we find ourselves confronted with

a case wherein a building has been constructed in good faith on another's land and, therefore, must hold that the owner of the land is not on that account the lawful and exclusive owner of the building. The building belongs to the person at whose cost it was constructed in good faith, his right being subject, of course, to the provisions of law and especially to those of section 370 of the Revised Civil Code, identical with section 361 of the Spanish Civil Code, and reading as follows:

"The owner of the land which has been built upon, sown, or planted in good faith, has the right to appropriate as his own the work, sowing, or planting, by previously paying the indemnity specified in sections 455 and 456 of Chapter III, Title V, and to oblige the person who has built or planted to pay him the value of the land, and the person who sowed, to pay the corresponding rent."

Therefore, the judgment appealed from should be affirmed as to that portion thereof adjudging the land to belong to the plaintiff and reversed in that part declaring that the building thereon likewise belongs to the plaintiff, the question of the building to be governed by the provisions of section 370 of the Revised Civil Code.

> *Affirmed in part and reversed in regard to the building erected on the lot in litigation.*

Chief Justice Hernández and Justices MacLeary, Wolf and Aldrey concurred.