EL PUEBLO, APELADO, *v.* EL MUNICIPIO DE SAN JUAN, APELANTE.

APELACIÓN procedente de la Corte de Distrito de San Juan, Sección 1ª.

No. 886.—Resuelto en junio 6; 1913.

TIERRAS PÚBLICAS—CORONA DE ESPAÑA—TRATADO DE PARÍS.—Todas aquellas tierras pertenecientes a la Corona de España y de las cuales no se había desprendido válidamente el 10 de diciembre de 1898 en que se firmó el Tratado de París, pasaron a ser propiedad de los Estados Unidos de América con arreglo al artículo 8 de dicho Tratado.

ID.—POLÍTICA DEL CONGRESO DE LOS ESTADOS UNIDOS—CESIÓN AL PUEBLO DE PUERTO RICO.—De acuerdo con la política seguida por el Congreso de los Estados Unidos con respecto a los bienes públicos adquiridos por la nación americana de la nación española en la Isla de Puerto Rico, todas aquellas tierras así adquiridas y que por su naturaleza no corresponden al dominio nacional ni han sido expresamente reservadas para fines nacionales, han pasado a ser propiedad del Pueblo de Puerto Rico.

ID.—GOBERNADOR DE PUERTO RICO—SUS FACULTADES CON RESPECTO A CESIÓN DE TIERRAS PÚBLICAS—CONSTITUCIÓN AUTONÓMICA.—Ni la Constitución Autonómica de Puerto Rico de 25 de noviembre de 1897, ni las leyes anteriores, autorizaban al Gobernador de Puerto Rico bajo la soberanía española para ceder por su propio acuerdo las tierras reservadas por el gobierno nacional para alguno de sus ramos. Las concesiones y ventas de tierras públicas en Puerto Rico, se llevaron siempre a efecto bajo reglas establecidas en leyes debidamente promulgadas o se autorizaron por órdenes emanadas del poder real.

ID.—GOBERNADOR DE PUERTO RICO—GUERRA HISPANO-AMERICANA.—El hecho de la guerra hispano-americana no dió facultades extraordinarias al Gobernador de Puerto Rico para ceder al Municipio de San Juan tierras del dominio· nacional que no se traspasaron con motivo de la guerra, ni eran necesarias para los fines de la misma.

ID.—DOMINIO—PRESCRIPCIÓN.—Desde el comienzo de la soberanía americana no puede adquirirse por prescripción el dominio sobre tierras pertenecientes al Gobierno Nacional o al Insular.

ID.—ACCIÓN REIVINDICATORIA—ACTOS QUE NO IMPIDEN SU EJERCICIO—RENUNCIA DE DERECHOS.—El hecho de que el Gobernador de Puerto Rico autorizara la imposición de una hipoteca sobre bienes poseídos por un municipio para garantir una deuda del mismo y el de que el Departamento de Marina de los Estados Unidos por medio de su representante en Puerto Rico iniciara ciertas negociaciones, que no llegaron a tener realidad práctica, para la compra de dichos terrenos, no .impiden al verdadero dueño de dichas tierras el ejercicio de la acción reivindicatoria. Ni el Gobernador de Puerto Rico, ni el Departamento de Marina del Gobierno Nacional, sin autorización especial alguna, tienen facultades para renunciar un derecho que corresponde a la Legislatura de Puerto Rico o al Congreso de los Estados. Unidos.

ID.—CONSTRUCCIÓN DE BUENA FE EN SUELO AJENO.—Atendidas las circunstancias de este caso, el edificio contruído por el municipio demandado sobre el solar objeto de este pleito, lo fué de buena fe, siendo por tanto de aplicación lo preceptuado en el artículo 370 del Código Civil revisado.

Los hechos están expresados en la opinión.

Abogados del Pueblo: *Sres. Wolcott H. Pitkin, Jr., Attorney General, Charles E. Foote y Salvador Mestre, Fiscales.*

Abogados del apelante: *Sres. Ramón Falcón y Adrián Agosto.*

EL JUEZ ASOCIADO DEL TORO emitió la opinión del tribunal.

En el presente pleito se discute la propiedad de una parcela de terreno y de un edificio construído en la misma. Ambas partes, El Pueblo de Puerto Rico y el Municipio de San Juan, alegan que son dueños de los dichos bienes. La controversia se decidió por la Corte de Distrito de San Juan, Sección 1ª., en favor de El Pueblo, y el municipio entonces entabló el presente recurso de apelación.

Es un hecho histórico el del derribo de las fortificaciones en el recinto del este de la ciudad de San Juan.

"Largo y tenaz había sido el empeño en pro de esta reforma, cuyo primer intento acometiera en 1873 El General Primo de Rivera; al autorizar la apertura de la puerta de San Rafael y apoyara en

1894 Don Antonio Dabán al derribar la puerta de San Justo, que modificó el vetusto aspecto de la ciudad en su entrada por la marina, obteniéndose al fin la orden del Ministerio de la Guerra, que en 18 de mayo de 1897 puso en práctica el General Marín, haciendo volar el revellín de Santiago y toda la serie de baluartes desde el castillo de San Cristóbal hasta la puerta de San Justo.'' Historia de Puerto Rico por Salvador Brau, editada por D. Appleton y Compañía, página 291.

Nos hemos referido en primer término al derribo de las fortificaciones del recinto este de la ciudad de San Juan, porque partiendo de él se entiende mejor cómo se desenvolvieron los hechos que originaron la cesión por parte del Gobernador de Puerto Rico al Municipio de San Juan, de las tierras y edificio cuya propiedad se dicute en este pleito.

El 26 de julio de 1897 el Ayuntamiento de San Juan fué informado por su presidente acerca de una conferencia que éste había tenido con el Gobernador General de la Isla. En dicha conferencia el Gobernador manifestó que el pabellón que ocupaba temporalmente el cuerpo de orden público no pertenecía al derribo de las murallas, pero que él permitiría su demolición junto con aquéllas a condición de que el municipio construyese una casa para cuartel de orden público y adosado al cuartel un pabellón para el Mayor de Plaza, y prometió además que influiría y haría que se cediese al ayuntamiento gratuitamente la aduana vieja con todos sus materiales y el solar que ocupaba y asimismo el solar o solares que en el ensanche se necesitaran para ubicar el edificio que el ayuntamiento se comprometiera a construir con el objeto indicado.

El informe termina así: ''Entiende, pues, la Presidencia, que debe pasar todo esto a informe del arquitecto que lo hará con presupuesto proporcionado de lo que puedan costar las obras que pide S. E. y los beneficios que reportarían a la ciudad, quitándonos de una y otra avenida semejantes estorbos * * *. Si el municipio lleva a cabo estas obras es indudable que habrá terminado la Avenida Dabán de una manera

completa, hermoseando todos aquellos alrededores y es indudable y seguro que obtendría los plácemes del vecindario.''

El arquitecto formó el proyecto de las obras cuyo importe ascendía a $17,938.40, y entonces el municipio acordó elevarlo a la superioridad y si era aprobado comprometerse a construir el expresado · edificio destinado a cuartel, recibiendo además el ayuntamiento la antigua aduana y los pabellones al este del Teatro y Plaza de Colón. El acuerdo se tomó en la sesión del 10 de septiembre de 1897.

El Gobernador aprobó el proyecto con ligeras modificaciones y así lo comunicó al alcalde el 7 de octubre de 1897. Las modificaciones fueron aceptadas por el ayuntamiento.

El 20 de octubre de 1897 los señores Don Ramón Poveda, Comisario de Guerra, en representación del Cuerpo Administrativo del Ejército, Don Armando Morales, Maestro de Obras Militares, por el Cuerpo de Ingenieros del Ejército, y Don Arturo Guerra, Arquitecto Municipal, por el ayuntamiento, se reunieron por disposición del Capitán General ''para que se designe y demarque un solar del terreno reservado al ramo de guerra, adyacente por el norte a los del ensanche del este de esta ciudad, con destino a cuartel de orden público y se entregue al Excmo. Ayuntamiento sin otro carácter que el de los efectos de construcción de dicho edificio, volviendo, ejecutada ésta, a la propiedad del ramo de guerra,'' y una vez allí constituídos procedieron a plantear el solar que quedó deslindado convenientemente. El solar medía 35 metros de frente por 44 de fondo. Así resulta del acta levantada que obra a los folios 9 y 10 de la transcripción, y que fué aprobada por el ayuntamiento en su sesión de octubre 28, 1897.

Pasó cerca de un año y, el 22 de agosto de 1898, el alcalde de San Juan trasmitió al Gobernador de la Isla un acuerdo del ayuntamiento solicitando ''autorización para trasladar los asilados municipales al edificio que para cuartel de orden público está construyendo dicha corporación en el barrio de Puerta de Tierra de la capital y que se le ceda en propiedad el solar donde está enclavado dicho edificio, y éste, toda

vez que con motivo de los sucesos actuales no tiene razón de ser el objeto para que se destinó.'' El Gobernador consideró la petición del ayuntamiento y ordenó que se llevara a cabo la cesión solicitada en la forma reglamentaria. Así se comunicó el 7 de septiembre de 1898 por B. Francia, al alcalde de San Juan. La entrega formal se verificó el 9 de septiembre de 1898.

En sesión extraordinaria celebrada por el ayuntamiento el 10 de septiembre de 1898 se leyó un oficio del Gobierno General de fecha 3 de septiembre, sobre cesión al municipio del edificio construído para cuartel de orden público y del solar en que el edificio está enclavado, con objeto de que se destinara a asilo municipal de caridad, y se acordó tributar ''un expresivo voto de gracias a la Superior Autoridad de la Isla por tan valiosa cesión,'' acordándose también solicitar la cesión de dos zonas de terreno contiguas a la cedida, una de 65 metros de frente por 55 de fondo y otra de 35 metros de largo por 11 de ancho.

El 17 de septiembre de 1898 el Capitán General M. Macías comunicó al alcalde, que en vista del acuerdo de la corporación municipal solicitando la cesión de las dos otras zonas de terreno indicadas, había ''tenido a bien acceder a la petición de dicha corporación, disponiendo con esta fecha se lleve a cabo la cesión de referencia en la forma reglamentaria.'' El 21 de septiembre se verificó la entrega formal de las dos nuevas zonas cedidas.

Las propiedades así cedidas al municipio, fueron inscritas a su nombre en el registro de la propiedad e hipotecadas luego varias veces para responder de deudas contraídas por el municipio. Para constituir alguna de dichas hipotecas, la corporación municipal fué autorizada por el Gobernador interino W. H. Hunt. Las hipotecas se habían cancelado al tiempo de establecerse este pleito. Aparece, además, que el Departamento de Marina de los Estados Unidos trató de comprar al municipio los terrenos en cuestión, sin que se llegara a contratar nada en definitiva.

Expuestos los anteriores hechos cuya certeza consta de la prueba que figura en la transcripción del récord elevada a esta Corte Suprema, veamos si la parte demandante justificó o nó su derecho de propiedad sobre las tierras y el edificio cedidos al demandado en la forma indicada y poseídos por el mismo en la actualidad. Estudiaremos primero la cuestión relativa al dominio de las tierras y luego la referente al dominio del edificio.

Es indudable que las tierras de que se trata pertenecían a la reserva del ramo de guerra de la nación española y que no estaban incluídas dentro de las que se destinaron a ensanche de la población de San Juan. Para mayor claridad debemos consignar, que en la misma R. O. de abril de 1897 en que se autorizó el derribo de las fortificaciones del recinto este, se trazó y acordó un plan de ensanche de la ciudad de San Juan hacia el este. También se acordó la venta de terrenos reservados al Ramo de Guerra situados en el barrio de la Marina. Todas dichas tierras debían entregarse para su venta a la Hacienda y el producto de la venta depositarse en el Tesoro con destino exclusivo a las fortificaciones y edificios del Ramo de Guerra. Cuando la soberanía americana sustituyó a la soberanía española en la Isla de Puerto Rico, el plan de ensanche no se había llevado a la práctica.

Perteneciendo, pues, las tierras en disputa a la Corona de España, si ésta no se había desprendido válidamente de ellas el 10 de diciembre de 1898 en que se firmó el Tratado de París, es indudable que con arreglo al Art. VIII del Tratado, su propiedad pasó a los Estados Unidos de América.

La política seguida por el Congreso de los Estados Unidos con respecto a los bienes públicos adquiridos por la nación americana de la nación española en la Isla de Puerto Rico, ha sido la de ceder a ésta todos los dichos bienes, con excepción de aquellos que por su naturaleza corresponden al dominio nacional y de los expresamente reservados para fines nacionales. Ni en los unos, ni en los otros se encuentran comprendidos los terrenos de que se trata en este pleito. Si

algún título, pues, adquirieron sobre ellos Estados Unidos, dicho título pasó a El Pueblo de Puerto Rico. Véase la sec. 13 de la Ley Orgánica de Puerto Rico; las leyes de los Estados Unidos de julio 1, 1902, 32 Stat. L., 731; de marzo 4, 1907, 34 Stat. L., 1410, y de junio 14, 1910, 36 Stat. L., 467; las leyes de Puerto Rico de febrero 16, 1903, leyes de 1903, p. 112, y de marzo 14, 1907, leyes de 1907, p. 317; las Proclamas del Presidente de los Estados Unidos de marzo 29, 1899, 1 Compilation of Acts, etc., relating to Noncontiguous Territory, 391; de 17 de enero de 1903, tomo 1, pág. 400 de la misma compilación; de junio 26, 1903, tomo 2, pág. 279, de la misma compilación; de junio 30, 1903, tomo 2, pág. 281 de la misma compilación; de agosto 4, 1908, tomo 4, pág. 605 de la misma compilación, y de enero 26 y julio 13 de 1912, Vol. IV, No. 4 de la Gaceta Oficial, pág. 383, y el artículo 5 del Código Político.

Establecidas las anteriores conclusiones, debemos entrar a considerar y a resolver la cuestión decisiva, a nuestro juicio, en este pleito: la de si el Gobernador de Puerto Rico tenía o nó facultades para ceder las tierras reservadas al ramo de guerra de España, al municipio de San Juan.

Las cesiones se verificaron, la primera, o sea la del solar de 35 metros de frente por 44 de fondo, en que estaba enclavado el edificio, el 3 o el 7 de septiembre de 1898, y la segunda, o sea la de las zonas de terreno de 65 metros de frente por 55 de fondo y de 35 metros de largo por 11 de ancho, el 17 de septiembre de 1898.

En el mes de septiembre de 1898 regía en Puerto Rico el Real Decreto referente a la Constitución Autonómica de la Isla de 25 de noviembre de 1897. Vol. 162 de la Colección Legislativa de España, p. 508 y siguientes. Por dicha ley el Gobernador General (art. 2) era el representante de la Metrópoli y ejercía en nombre de ésta la Autoridad Suprema. Le correspondían en tal concepto, (art. 41), como Vicerreal Patrono las facultades inherentes al patronato de Indias; el mando superior de todas las fuerzas armadas de mar y tierra

existentes en la Isla; la delegación de los Ministerios de Estado, Guerra, Marina y Ultramar; le estaban subordinadas todas las demás autoridades de la Isla y era responsable del orden y de la seguridad de la colonia. "El Gobernador General, como representante de la Nación, dice el art. 42 de la expresada ley, ejercerá por sí, y auxiliado por su secretaría, todas las funciones indicadas en el artículo anterior y las que ,puedan corresponderle como Delegado directo del Rey en los asuntos de carácter nacional." Luego se especifica en el mismo artículo lo que correspondía al Gobernador como representante de la Metrópoli.

También especifica la ley (art. 43) lo que correspondía al Gobernador como autoridad superior de la colonia y jefe de su administración. Cuando actuaba en este carácter, para que su mandato pudiera llevarse a efecto (art. 44), debía refrendarse por un Secretario de Despacho, quien por tal acto se hacía de él responsable. Este aspecto de la cuestión no tiene importancia porque el acto realizado por el Gobernador no se refería a la administración colonial, sino a la nacional. Los bienes cedidos no pertenecían a la Colonia, sino a la Nación.

Hemos examinado cuidadosamente no sólo las disposiciones citadas sino el Decreto Autonómico en su totalidad y no encontramos en ninguna de sus prescripciones que se autorice al Gobernador para ceder por su propio acuerdo las tierras reservadas por el Gobierno nacional para algunos de sus ramos. Hemos examinado las leyes anteriores y tampoco hemos podido encontrar precedente alguno que pudiera servir de fundamento a tal autoridad. Por el contrario, todos los precedentes demuestran que las concesiones y ventas de tierras públicas de Puerto Rico se llevaron a efecto bajo reglas establecidas en leyes debidamente promulgadas o se autorizaron por órdenes emanadas del poder real. Claros ejemplos de esto último pueden encontrarse en la R. O. para la enajenación de fincas del Estado, de enero 24, 1857, 9 San Pedro, Legislación Ultramarina, 440; en la R. O. sobre enajenación de

unos solares en el barrio de la Marina de la Capital de Puerto
Rico, de abril 25, 1867, 10, San Pedro, Legislación Ultrama-
rina, 750; y en la misma Real Orden relativa al derribo de las
fortificaciones del recinto este y al ensanche de la ciudad de
San Juan. Para un estudio general de la materia, puede con-
sultarse la citada Legislación Ultramarina, tomo 4, págs. 666–
689.

Siendo esto así, no habiéndose llevado a efecto las cesiones
de acuerdo con ninguna ley general, ni en cumplimiento de
orden especial alguna, y no teniendo el Gobernador autori-
dad para verificarla por sí mismo, es necesario concluir que
dichas cesiones son nulas, y que, en tal virtud, no pudo trans-
ferirse por ellas la propiedad de las tierras al municipio,
propiedad, que continuó en la Nación Española; que fué trans-
mitida por ésta a la Nación Americana, y por la Nación Ame-
ricana al Pueblo de Puerto Rico en la forma que dejamos
indicada.

En el caso de *Mumford* v. *Wardwell,* 6 Wall., 435, la Corte
Suprema de los Estados Unidos, se expresó en los siguientes
términos: ''El gobierno mejicano cesó en aquel departamento
el día 7 de julio, 1846, en cuya fecha pasó éste al dominio
de nuestras autoridades militares. También continuó en vi-
gor el gobierno municipal por algún tiempo, al frente del cual
quedaron los funcionarios subalternos nombrados por nues-
tros jefes militares. Dicho jefe se conocía con el nombre
de gobernador militar, quien por algún tiempo creyó estar
investido de las mismas facultades civiles que había tenido
anteriormente el gobernador mejicano del departamento. Por
virtud de dicha pretendida autoridad el General S. N. Kear-
ney en 10 de marzo, 1847, como gobernador militar del terri-
torio, concedió a la ciudad de San Francisco todo el derecho,
título e interés de los Estados Unidos a las riberas y super-
ficies de terrenos cubiertas por las aguas, hacia el lado este,
de la ciudad, comprendido entre ciertos puntos que han sido
descritos, exceptuando aquellas superficies que pudieran ele-
girse para uso del gobierno.'' * * * ''Pero la facultad

para conceder terrenos o ratificar títulos jamás estuvo investida en nuestros gobernadores militares, de donde resulta necesariamente que la concesión tal como se hizo primeramente era nula y sin ningún valor. La ciudad nada adquirió por virtud de la concesión y por tanto los actos ejecutados por el alcalde al vender los terrenos en cuestión, fueron meramente nulos.''

Véase también el caso de *United States* v. *Vigil* decidido por la misma corte y reportado en 13 Wall., 449, en el que se resolvió que cierta concesión de tierras hecha por una Asamblea Departamental de Méjico era nula por no estar dicha Asamblea investida de la facultad de disponer de los bienes del dominio público.

Hemos consultado muchos de los casos sobre concesiones mejicanas resueltos por la Corte Suprema de California y por el Tribunal Supremo de los Estados Unidos, y opinamos que no son aplicables al presente. En los casos de Méjico los Gobernadores o Jefes Políticos de los Departamentos, de acuerdo con las Reglas para la Colonización de los departamentos de la República, de 21 de noviembre de 1828, estaban autorizados expresamente para conceder las tierras baldías en sus respectivos territorios. 10 Cal., 636.

También hemos consultado el caso de *Jover* v. *Insular Government,* 221 U. S., 623, en el que la Corte Suprema de los Estados Unidos aceptó como válida cierta concesión de terrenos públicos bañados por el mar, hecha por el Gobernador de Filipinas en el año de 1859, y opinamos que tampoco es enteramente aplicable a este caso, pues el Gobernador de Puerto Rico no estaba en 1898 investido de las mismas extraordinarias facultades que el de Filipinas en 1859.

El 25 de abril de 1898 el Congreso de los Estados Unidos declaró la existencia de una guerra entre los Estados Unidos y España. El 25 de julio de 1898, desembarcó el ejército americano en Puerto Rico. El 12 de agosto de 1898, se firmó el protocolo de paz, por el cual se suspendieron las hostilidades, y el 10 de diciembre de 1898 como hemos dicho se firmó el

Tratado de París. El hecho de la guerra se aprecia de modo distinto por ambas partes en este pleito. Por el demandado, como fundamento para alegar que el Gobernador General de Puerto Rico tenía facultades extraordinarias dentro de las cuales estaba la de poder disponer de las tierras del dominio nacional. Por el demandante, para alegar la existencia de mala fe por parte del Gobernador, que conociendo que la soberanía española se iba a extinguir para siempre en Puerto Rico, trató de privar a la nueva soberanía del dominio de las tierras en cuestión.

Ninguna de las partes tiene razón en este punto a nuestro juicio. La demandada, porque las cesiones no se hicieron con motivo de la guerra, ni eran necesarias para los fines de la guerra, habiéndose llevado a afecto, además, después de suspendidas las hostilidades entre España y los Estados Unidos, y la última de ellas, la del 17 de septiembre de 1898, después de la ley de 16 de septiembre de 1898 autorizando al Gobierno para renunciar a los derechos de soberanía y ceder territorios en las provincias y posesiones de Ultramar, conforme a lo estipulado en los preliminares de Paz con el Gobierno de los Estados Unidos. Vol. 2, año 1898. Colección Legislativa de España, p. 273. Y la demandante, porque nada en este caso revela la mala fe por parte del Gobernador ni por parte del municipio, sino más bien el deseo de dedicar un pedazo de las tierras nacionales situado fuera de las fortificaciones y al extremo de terrenos destinados a ensanche de la población, a una institución sostenida por una corporación pública para beneficio del pueblo.

Se alega por el demandado que aun cuando el Gobernador no hubiera tenido autoridad para hacer las cesiones, el municipio habría siempre adquirido por prescripción el dominio de las tierras. Las cesiones se verificaron en 1898 y en ese mismo año cesó la soberanía española en Puerto Rico. Cuando la nueva soberanía comenzó, es evidente que el demandado no había adquirido por prescripción derecho alguno, y, después de comenzada, dicho medio de adquisición de propiedad no

estaba autorizado en contra de los Estados Unidos, ni en contra de Puerto Rico. Véase el caso de *El Pueblo* v. *Dimas,* 18 D. P. R., 1073 y 1081 y siguientes, en donde esta cuestión se trata con la extensión debida.

El hecho de que el Departamento de la Armada de los Estados Unidos iniciara por medio de su representante en Puerto Rico, ciertas negociaciones que no llegaron a tener realidad práctica, para la compra de los terrenos, y el de que el Gobernador de Puerto Rico autorizara la imposición de una hipoteca sobre los mismos para garantir una deuda del ayuntamiento, no constituyen un impedimento para el ejercicio de su acción en este pleito por parte del demandante. El municipio se encontraba en posesión de los terrenos aparentemente bajo un justo título y nada tiene de particular que se le considerara y tratara como al verdadero dueño. Pero esto no puede estimarse como suficiente para impedir que si investigado el caso y averiguado que las cesiones del Gobernador se hicieron sin autoridad legal para ello, el verdadero dueño ejercite la acción correspondiente para reivindicar su derecho. Además, aun cuando el Departamento de Marina de los Estados Unidos o el Gobernador de Puerto Rico hubieran reconocido expresamente al demandado como dueño, esto no impediría a los Estados Unidos o a Puerto Rico el ejercicio de su derecho si en realidad de verdad lo tenían, porque ni los Departamentos del Gobierno Nacional, ni el Gobernador de Puerto Rico, actuando ambos por su propia autoridad y sin autorización especial alguna, tienen facultades para renunciar derechos que correspondan al Congreso de los Estados Unidos o a la Legislatura de Puerto Rico en su caso.

Decidiendo el pleito, pues, de acuerdo con la ley, se impone la confirmación de la sentencia apelada, en cuanto a la reivindicación de los terrenos cedidos por el Gobernador General de Puerto Rico al Municipio de San Juan.

Estudiaremos y resolveremos ahora la cuestión relativa al edificio. Aparece de los hechos consignados con anterioridad que el Ayuntamiento de San Juan se comprometió a

fabricar un cuartel de orden público para entregarlo al Gobierno Insular, a cambio de que se derribara junto con las fortificaciones el pabellón que ocupaba temporalmente el dicho cuerpo de orden público y se cediera al ayuntamiento gratuitamente la aduana vieja y el solar que ocupaba. Y aparece además que aun no se había terminado la construcción del cuartel, cuando fué cedido junto con las tierras por el Gobernador al ayuntamiento, y que el cuartel se construyó con fondos del municipio.

Siendo esto así, no alegándose en la demanda ni demostrando la prueba que el viejo pabellón de orden público se hubiera derribado, ni que se hubiera entregado al ayuntamiento el solar y el edificio de la antigua aduana, y habiendo llegado a la conclusión de la falta de autoridad por parte del Gobernador para decidir por sí solo este asunto y a la de que tanto el Gobernador como el ayuntamiento actuaron de buena fe, es necesario aceptar que nos encontramos frente a un caso de fabricación de buena fe en suelo ajeno, y como consecuencia reconocer que el dueño del suelo por el solo hecho de serlo no es el dueño legítimo y único de la fabricación. Esta pertenece al que a su costa de buena fe la hizo, sujeto, desde luego, su derecho, a lo prescrito en la ley y especialmente en el artículo 370 del Código Civil revisado, igual al 361 del Código Civil español, que dice así:

"El dueño del terreno en que se edificare, sembrare o plantare de buena fe, tendrá derecho a hacer suya la obra, siembra o plantación, previa la indemnización establecida en los artículos 455 y 456 del Capítulo III, Título V, o a obligar al que fabricó o plantó, a pagar el precio del terreno, y al que sembró, la renta correspondiente."

En tal virtud la sentencia apelada debe confirmarse en cuanto por ella se declaró que las tierras de que se trata pertenecen al demandante, y revocarse en cuanto por ella se declaró de igual modo que el edificio construído sobre dichas tierras pertenece también al demandante, debiendo regularse

el caso del edificio de acuerdo con lo prescrito en el artículo 370 del Código Civil Revisado.

*Confirmada en parte y revocada en cuanto al edificio construido sobre el solar en litigio.*

Jueces concurrentes: Sres. Presidente Hernández y Asociados MacLeary, Wolf y Aldrey.