GOBIERNO DE LA CAPITAL, demandante y apelante, *v.* CASINO ESPAÑOL, demandado y apelado.

Núm. 7731.—*Sometido:* Abril 2, 1940. *Resuelto:* Mayo 22, 1940.

*J. Valldejuli Rodríguez,* abogado del apelante; *R. Cuevas Zequeira,* abogado del apelado.

EL JUEZ PRESIDENTE SEÑOR DEL TORO emitió la opinión del tribunal.

Versa este pleito sobre reivindicación de bienes muebles. Se reclama un retrato de Isabel II, Reina de España, pintado por Federico Madrazo. Fué resuelto en contra de la parte demandante que apeló y señala en su alegato dos errores, el primero atribuído a la corte sentenciadora al apreciar la prueba y el segundo al declarar prescrita la acción ejercitada.

El debate fué planteado por el Gobierno de la Capital de Puerto Rico, parte demandante, como sigue:

El Gobierno de la Capital es el sucesor del Municipio de San Juan, y como tal, dueño del retrato reclamado. Este se encuentra en la posesión ilegal del demandado. Vale treinta mil dólares.

El Casino Español, demandado, negó que el demandante fuera dueño del retrato y en contrario alegó que él es el dueño por haberlo adquirido por donación que le hiciera en 1913 don Manuel Fernández Juncos.

Como materia nueva alegó que la acción ejercitada por el demandante había prescrito de acuerdo con los artículos 1863, 1856 y 616 del Código Civil Revisado que corresponden a los artículos 1862, 1855 y 549 de la edición de 1930.

Fué el pleito a juicio y la corte lo resolvió por sentencia de septiembre 12, 1936, como ya dijimos, en contra del demandante, por estimar que el retrato se encontraba en la legítima posesión del demandado a virtud de donación que le hiciera don Manuel Fernández Juncos y el tiempo transcurrido. Declaró prescrita la acción del demandante.

Examinemos la prueba. El primer testigo que llamó el demandante fué Roberto H. Todd. Dijo, en resumen, que a partir del 1903 sirvió como Alcalde de San Juan por muchos años y en varias ocasiones, y antes, en 1901, como Concejal. No vió el retrato de que se trata en el municipio. Se le mostró un libro titulado "Inventario firmado el 25 de septiembre de 1873" en cuya página 6 tiene la siguiente anotación: "Un

retrato al óleo de cuerpo entero, de doña Isabel II, de marco dorado. Cuatro mil pesos'', y manifestó que suponía que fuera del Ayuntamiento de San Juan. El libro fué introducido en evidencia y admitido sin objeción.

Vió el retrato en casa de don Manuel Fernández Juncos, un español bien acreditado, de muy buen arraigo entre puertorriqueños y españoles, que fué Ministro de Hacienda durante la Autonomía. El retrato estaba en la sala junto a otros cuadros. Volvió a verlo en el Casino Español cuando estaba en la calle de la Fortaleza, en su salón principal. En mejores condiciones que antes. Observó que tenía la siguiente inscripción, ''Ayuntamiento de Puerto Rico'' y luego el nombre del autor, Madrazo. Era el testigo entonces Alcalde de San Juan y no hizo gestión alguna para reclamar el retrato. Nada manifestó en sentido contrario a un inspector de Auditoría. Se comunicó con el Sr. Pérez Lozada, Secretario del Casino, quien le dijo que éste había adquirido el retrato por donación o compra, no recuerda bien, de don Manuel Fernández Juncos. Y no investigó más.

Se leyó entonces una declaración jurada de José Mauleón, manifestando que comenzó a trabajar en el Ayuntamiento de San Juan de Puerto Rico, hoy Gobierno de la Capital, siendo Alcalde Militar el Dr. Francisco del Valle Atiles y entonces vió en el salón de sesiones del Ayuntamiento el cuadro de que se trata. Que los cuadros permanecieron allí hasta el cambio de soberanía en 1899 y luego no sabe por qué no continuaron en la posesión del Pueblo en el Ayuntamiento.

Llamado Arsenio R. Rodríguez, inspector de la oficina del Auditor de Puerto Rico declaró que como tal practicó una investigación en los libros del Gobierno de la Capital relacionada entre otras cosas con el retrato de la Reina Isabel II pintado por Madrazo y habló con el Sr. Todd al igual que con los Sres. Mariano Abril, Adolfo de Hostos y Mario Brau respecto del asunto; que examinó el inventario que cubre hasta el año 1873 y rindió su informe.

Luis A. Castro, Secretario de la Capital, dijo que el archivo del municipio data de 1631 y hecho un examen no encontró en él documento oficial alguno del que conste que el Municipio se desprendiera de la propiedad o posesión del cuadro de doña Isabel II. Sí consta que el cuadro se compró por suscripción de los vecinos de San Juan quienes lo donaron al Municipio.

Esa fué la evidencia aportada por el demandante. El demandado llamó a Juan García Verdomar, de setenta y cinco años de edad, nacido en la Coruña, España. Llegó a esta isla en diciembre 3, 1885. Fué empleado del Municipio desde mediados de julio, 1890, guardia urbano primero, luego ordenanza del Alcalde. Continuó sirviendo hasta que el Sr. Todd desempeñó la Alcaldía siendo entonces jubilado. Vió en el salón de sesiones el retrato de la Reina. Recuerda que cuando el cambio de soberanía, 1898, vió a don Manuel Fernández Juncos en el Ayuntamiento con otros señores paseando por las galerías inmediatas al salón y hablando "de los objetos de España", y observó que un señor preguntó a don Manuel "¿Para qué tú quieres eso?" y que él contestó, "Pues para hacer un museo."

José Pérez Lozada, Secretario del Casino Español desde 1909, declaró que en el Casino había dos retratos de la Reina Isabel II pintados por Madrazo, uno de ellos de tamaño monumental, de cuerpo entero, que fué adquirido por donación de don Manuel Fernández Juncos, prócer de la colonia española, reconocido tanto como amigo de los españoles como del país puertorriqueño.

Presentado al testigo un libro, lo reconoció como el de actas del Casino de 6 de diciembre 1907 a marzo 1916. El demandado introdujo en evidencia el párrafo final del acta que figura a la página 249 en lo relativo al cuadro de la Reina Isabel II. Se admitió con la objeción del demandante.

Siguió el testigo declarando que desde 1913 en que el cuadro fué donado al Casino, éste lo colocó en el salón anexo

al de baile. Cuando el Casino se instaló en la Calle de San José y luego en la de Fortaleza, estaba en el salón de baile. Ahora, en la Casa de España, está en el salón de lectura. El retrato fué retocado y barnizado y se le puso un marco nuevo. El Casino nunca ha sido inquietado en la posesión del mismo. La inscripción que el retrato tiene dice "Ayuntamiento de Puerto Rico, 1866."

Recuerda haber visto el retrato en casa de don Manuel Fernández Juncos allá por el año 1899 ó 1900 y le consta personalmente que don Manuel lo donó al Casino. Este no tiene edificio. Está alojado en la Casa de España con otra institución española. El solo documento que tiene para acreditar la donación es el acta. El retrato puede valer cinco mil pesos.

Compareció Ramón Fernández Náter, hijo de don Manuel. Dijo que el retrato en litigio fué llevado a su casa allá por el año 1898, en octubre. Antes lo tenían tirado en el Municipio en un cuarto que había abajo donde había trastos viejos. Lo llevaron a su casa junto con otros objetos procedentes del Municipio. "Mi padre vió ese cuadro allí y él sintió mucho esto y habló con el Alcalde don Francisco del Valle Atiles, y don Francisco le dijo que no tenía inconveniente en cederle ese cuadro a él, pero tenía sus temores que había un gobernador militar, el General Ortega, que sin él . . . . Estuvo (el General) en casa . . . . le dijo a mi padre que él no ponía ningún inconveniente en que esos cuadros pasaran a manos de él, que fueran para él."

Manifestó que el retrato estuvo siempre colocado en sitio ostensible en las varias casas que vivió su padre. "Al morir mi madre, quedó mi padre solo, con mis hermanas, y cogieron una casa más pequeña y papá le regaló ese retrato de Isabel II al Casino Español." Durante el tiempo que el cuadro estuvo en poder de su padre, nunca fué reclamado por el Municipio.

Llamado Angel Cruz, Archivero del Gobierno de la Capital desde julio 1934 citado para que trajera los inventarios

posteriores al 1898, declaró que dado el término breve que se le diera no pudo encontrarlos, no siendo fácil la búsqueda porque no estaban organizados.

Se le presenta un libro y contesta, ''Por el conocimiento que tengo, y lo que puedo leer aquí, es un libro de actas que dice 'Material Ayuntamiento San Juan, 1899.' '' Se le pide que diga si en el libro ''aparece o no un acuerdo relativo a un cuadro de la reina doña Isabel II de España.'' Contesta que para ello tendría que leer todo el libro. El incidente se repite en relación con otros, sin que el testigo aporte dato concreto alguno sobre el particular.

Terminada la prueba del demandado, el demandante llamó nuevamente al Inspector de la Auditoría de Puerto Rico Arsenio R. Rodríguez. Dijo que la oficina del Auditor tiene a su cargo la propiedad y cuentas de los Municipios de Puerto Rico. Se le muestran los libros de actas del Municipio de San Juan de 1898, 1900 y 1901 y dijo que los había examinado cuando practicó la investigación y también otros—1895 a 1935—''página por página buscando a ver si existía algún acuerdo donde se donara, transfiriera, vendiera o de modo alguno se cedieran esos cuadros de la Reina Isabel II, pintado por Madrazo, y el de don Ramón de Castro, pintado por Campeche'', al Casino Español o al señor Marxuach. La investigación, que ordenó el Auditor como consecuencia de una denuncia, le llevó un mes completo. Rindió un informe, copia del cual se ofrece en evidencia. Se opone el demandado y el Juez resuelve ''que quede como prueba ofrecida y no admitida.''

La declaración termina así:

''P.—¿En alguna ocasión se quejó el Municipio de San Juan o el Gobierno de la Capital de que le faltaban esos cuadros?

''R.—No señor.

''P.—¿De modo que eso obedeció a una queja de un individuo particular, a una denuncia?

''R.—Sí señor.''

Sigue la declaración de Mario Brau Zuzuárregui, Director del Museo Insular. A la fecha del juicio tenía sesenta y seis años. Conoció el Ayuntamiento de Puerto Rico desde la edad de diez—la Casa Consistorial—donde había varios retratos, entre ellos el de Isabel II. Asegura que el cuadro de Isabel II estuvo allí hasta tres años y pico después de la llegada de los americanos, el mismo que luego vió en el Casino Español retocado y barnizado convenientemente. Calcula su valor en dos mil dólares.

Tras una serie de preguntas termina reconociendo que fué él el que originó esta controversia con miras más bien a que se investigara la suerte que había corrido no el retrato de Isabel II sino el del General Castro.

En la transcripción no aparece incluído el particular del libro de actas del Casino Español ofrecido en evidencia por el demandado y admitido por la corte con la oposición del demandante. A ese particular se refiere el juez sentenciador en su relación del caso y opinión, así:

"Sigue el señor Fernández Juncos en posesión del cuadro hasta 1913, fecha en que dicho señor lo dona al Casino Español, según aparece del acuerdo que figura en el acta de la sesión celebrada el 23 de diciembre de 1913 transcrito a los folios 248 y 249 del libro de actas de dicho centro social. El precitado acuerdo dice así:

" 'Se acuerda también aceptar el obsequio que don Manuel Fernández Juncos hace al casino con el muy apreciable presente del cuadro al óleo de la que fué Reina de España, doña Isabel II, pintado por el insigne Madrazo, y que se den al Señor Fernández Juncos las más cumplidas gracias.' "

Examinada la evidencia en relación con el fallo de la corte, hay que concluir que no fué cometido el primero de los errores señalados, o sea el que se refiere a la apreciación de la prueba.

Prescindiendo de ciertas manifestaciones innecesarias, más o menos justificadas, que su opinión contiene, lo que la corte sentenciadora declaró probado fué que desde 1866 el Municipio de San Juan poseía y tenía inventariado como de

su propiedad un cuadro de la Reina de España Isabel II, que decoraba el salón de actos de la casa consistorial; que al ocurrir el cambio de soberanía (1898) don Manuel Fernández Juncos obtuvo del Alcalde de San Juan Sr. Francisco del Valle Atiles con la intervención del último Gobernador Militar Español de la Isla, General Ortega, la entrega de dicho cuadro, poseyéndolo desde entonces y donándolo en 1913 al Casino Español que aceptó la donación y colocó el cuadro en sitio visible en los varios edificios que ha ocupado, poseyéndolo a su vez sin reclamación de nadie hasta enero 20, 1936, en que este pleito fué entablado. Y esa declaración de hechos probados encuentra amplio apoyo en la evidencia.

Ahora bien ¿pudo el Alcalde por sí solo o con el asentimiento del Gobernador, disponer del cuadro, en la forma en que lo hiciera? ¿Adquirió don Manuel Fernández Juncos un título válido a la propiedad del retrato, a virtud de la entrega?

Esas preguntas tienen necesariamente que contestarse en la negativa. No cabe otra respuesta. El acto del Alcalde y el del Gobernador no estuvieron autorizados por la ley. Ellos no tenían facultad para disponer de la propiedad del Municipio en la forma en que lo hicieron. El Sr. Fernández Juncos no adquirió por la entrega derecho al dominio del retrato. Ley Municipal de 1896, artículos 89 y siguientes y 118 y siguientes; *Pueblo* v. *Municipio de San Juan,* 19 D.P.R. 656.

Pero la entrega fué una realidad y realidades también fueron la posesión del retrato por parte de don Manuel Fernández Juncos públicamente, en concepto de dueño y sin interrupción hasta 1913, la donación hecha por él en esa fecha al demandado, la aceptación por éste y su posesión pública, pacífica, como dueño, hasta 1936, y esas realidades se invocaron por el demandado como defensa a la acción ejercitada en contra suya.

¿Surge de ellas el derecho del Casino Español, demandado, a continuar en el disfrute del bien mueble de que se

trata, no obstante el título original del municipio y la entrega ilegal que del mismo se hiciera al poseedor de quien trae causa el demandado, como resolvió la corte del distrito? Veámoslo.

El artículo 1862 del Código Civil, ed. 1930, invocado por el demandado, dispone:

"Artículo 1862.—Las acciones reales sobre bienes muebles prescriben a los seis años de perdida la posesión, salvo que el poseedor haya ganado por menos término el dominio, conforme al artículo 1855, y excepto los casos de extravío y venta pública, y los de hurto o robo, en que se estará a lo dispuesto en el párrafo tercero del mismo artículo citado."

El 1855 a que se hace referencia dispone:

"Artículo 1855.—El dominio de los bienes muebles se prescribe por la posesión no interrumpida de tres años con buena fe. .

"También se prescribe el dominio de las cosas muebles por la posesión no interrumpida de seis años, sin necesidad de ninguna otra condición.

"En cuanto al derecho del dueño para reivindicar la cosa mueble perdida o de que hubiese sido privado ilegalmente, así como respecto a las adquiridas en venta pública, en bolsa, feria o mercado, o de comerciante legalmente establecido y dedicado habitualmente al tráfico de objetos análogos, se estará a lo dispuesto en el artículo 393, capítulo III, título V, libro segundo de este código."

Y el 393:

"Artículo 393.—La posesión de los bienes muebles adquiridos de buena fe equivale al título. Sin embargo, el que hubiese perdido una cosa mueble o hubiese sido privado de ella ilegalmente, podrá reivindicarla de quien la posea.

"Si el poseedor de la cosa mueble perdida o sustraída la hubiese adquirido de buena fe en venta pública, no podrá el propietario obtener la restitución sin reembolsar el precio dado por ella.

"En cuanto a las cosas adquiridas en la bolsa, feria o mercado, o de un comerciante legalmente establecido y dedicado habitualmente al tráfico de objetos análogos, se estará a lo que dispone el Código de Comercio."

El 549 del propio cuerpo legal, también invocado por el demandado, al determinar los diferentes medios de adquirir la propiedad incluye entre ellos el de la prescripción y el de la donación.

Comentando Manresa el artículo 1962 del Código Civil Español igual al 1862 del nuestro que dejamos copiado, se expresa como sigue:

"Esta regla de prescripción es consecuencia de la establecida para la adquisitiva de dicha clase de bienes. En efecto: en el examen hecho de las disposiciones comprendidas en el artículo 1955, vimos que la prescripción ordinaria del dominio de las cosas muebles se producía por la posesión no interrumpida y con buena fe durante tres años, y la extraordinaria tenía lugar por el transcurso de seis años en la posesión de la cosa que se prescribe, sin necesidad del concurso de ningún otro requisito. Y si por virtud de cualquiera de dichas prescripciones el poseyente adquiere el dominio de dichas clases de bienes, es indudable que por el lapso del término marcado para cada una de ellas habrá de extinguirse el derecho del propietario, y por consiguiente, la acción que al mismo pudiera corresponder para reclamar o reivindicar la cosa objeto de la prescripción, porque no puede existir el dominio en dos personas distintas, a no ser en caso de indivisión. Por eso el artículo 1962, que establece dicha regla de prescripción, establece el término de seis años para cuando no haya ganado dicho dominio el poseedor por menos tiempo; es decir, para el caso de que no se haya producido con anterioridad la prescripción ordinaria.

"En cuanto a las otras salvedades que consigna, no son más que reproducción de las establecidas en el párrafo 3º. del citado art. 1955, según el cual, habrá de estarse en dichos casos a lo dispuesto en el 464, y como al ocuparnos de lo relativo al término para la prescripción adquisitiva de las cosas muebles expusimos cuanto a dichos extremos se refiere, nos remitimos a lo entonces dicho y no insistimos más en este punto." 12, Manresa, Comentarios al Código Civil, pág. 795 de la cuarta edición.

Lo antes dicho, en lo pertinente, fué:

"A primera vista parecerá que existe cierta contradicción entre el precepto del art. 1940, que exige en todo caso como condición precisa para la prescripción adquisitiva ordinaria la concurrencia de justo título, y el de los párrafos indicados del 1955 según lo que no

es necesario dicho requisito para la prescripción ordinaria ni para la extraordinaria en cuanto a las cosas muebles; pero dicha contradicción desaparece teniendo en cuenta lo dispuesto en el art. 464, con arreglo al cual, la posesión de los bienes de dicha clase, adquirida de buena fe, equivale al título, y, por lo tanto, la disposición del artículo 1940 en la parte que exige la concurrencia de dicho requisito se refiere a aquellos casos en que la posesión por sí solo no equivalga a él como sucede en la prescripción adquisitiva ordinaria de los bienes inmuebles.

"Fuera del caso de la prescripción de las cosas muebles con buena fe en todos los demás es necesario el justo título para la prescripción ordinaria; y faltando dicho requisito sólo puede tener lugar la extraordinaria.

"La prescripción extraordinaria de cosas muebles, autorizada por el párrafo 2°. del art. 1955 antes indicado, no requiere ningún otro requisito más que la posesión continuada por el término expresado en el mismo, y así lo tiene declarado el Tribunal Supremo, con relación a los efectos públicos, en sentencia de 31 de marzo de 1902 (93 J. C. 528), en la que, entre otras cosas, se estableció la doctrina de que 'el dominio de las cosas muebles, entre las cuales se comprenden los efectos públicos, prescribe por el transcurso de seis años, sin más requisito que el lapso de tiempo, y que la sentencia que no aplica esta doctrina consagrada por el segundo apartado del art. 1955 del Código Civil, lo infringe.' Excusado es decir que esa posesión continuada por dicho espacio de tiempo, que la ley estima como medio eficaz para la adquisición de dichos bienes por prescripción, ha de ser tenida en concepto de dueño, pues si bien la ley no lo dice, hay que sobreentenderlo así en vista del precepto del art. 447, que establece que sólo la posesión que se adquiere y disfruta en concepto de dueño puede servir de título para adquirir el dominio, pues la generalidad de dicha regla excluye toda distinción respecto de este particular entre la prescripción ordinaria y la extraordinaria." 12, Manresa, Comentarios al Código Civil Español, págs. 760 y 762 de la cuarta edición.

Véanse además las decisiones de esta corte en los casos de *García et al.* v. *Sabino et al.*, 19 D.P.R. 279 y *García et al.* v. *Suro et al.*, 19 D.P.R. 755, donde la cuestión de prescripción de bienes muebles ordinaria y extraordinaria se encuentra discutida.

Y si aplicamos la ley, el comentario y la jurisprudencia a los hechos de este caso, tendremos necesariamente que concluir que el primer poseedor ya había adquirido por prescripción extraordinaria el dominio del retrato cuando lo donó al actual y que aunque no fuera así, el actual o sea el Casino siempre lo habría adquirido ya se aplique el período de tres, ya el de seis.

No seis años transcurrieron en cuanto al primero, si que alrededor de catorce y no tres o seis en cuanto al segundo si que alrededor de veinte y tres. En junto entre ambos más de treinta que es el tiempo que se necesita para prescribir el dominio sobre bienes inmuebles.

Es, pues, evidente que a virtud de la prescripción adquirió en todo caso el demandado el derecho que alegó en su defensa y perdió el demandante el que ejercitó en su acción.

■ Sin embargo, el demandante alega que eso sería así si de particulares se tratara, pero que siendo él como es una corporación de gobierno creada para facilitar la administración del estado, la prescripción no corre en contra suya, es decir, sostiene que le es aplicable la máxima *Nullum tempus occurrit regi*.

En el caso de *El Pueblo* v. *Dimas*, 18 D.P.R. 1061, 1081, dijimos:

"Al fijar los derechos del demandado en este caso con referencia a la cuestión de prescripción, sólo podemos considerar los hechos acaecidos hasta el año de 1898 en que cesó la soberanía española en esta Isla y comenzó la americana. A partir de esa fecha, no era posible adquirir por prescripción los terrenos de que se trata en este pleito. A este respecto se expresa así el juez sentenciador:

" ' ....Según la máxima *Nullum tempus occurrit regi*, aplicada en el derecho inglés como una regla invariable, no podía adquirirse ningún título a los terrenos de la Corona por la posesión adversa de los mismos. Esta regla ha sufrido más tarde algunos cambios por los estatutos. La doctrina inglesa prevalece en los Estados Unidos, donde como en Inglaterra, no puede adquirirse título alguno contra la Soberanía por medio de la posesión adversa. De acuerdo con este principio, únicamente por medio de una ley del Congreso haciendo directamente la concesión o autorizando a algún funcionario público

para que la lleve a efecto, es que puede adquirirse el dominio sobre terrenos pertenecientes al Estado. En este caso, aunque los terrenos cedidos a los Estados Unidos pudieran adquirirse por prescripción bajo las antiguas leyes, no obstante, si el dominio no llegó a consolidarse en el poseedor antes de haberse realizado la cesión, la prescripción no puede alegarse contra los Estados Unidos. Véase sobre estos extremos el tomo 1, pág. 1111 y 1112 del Cyc.

" 'El mismo principio se aplica en favor de los Estados de la Unión. En la ausencia de una disposición autorizando la prescripción de los terrenos que a los Estados pertenezcan, no puede adquirirse título por la posesión adversa.

" 'Aunque la Legislatura del país hubiese permanecido en silencio, el dominio del pueblo sobre los terrenos de su propiedad no podría prescribir hoy aplicando la misma regla que a los Estados se aplica La Asamblea Legislativa, sin embargo, ha consignado este precepto en el Código Político, cuyo artículo 9 dice de modo claro y terminante, que no puede adquirirse título a terrenos baldíos insulares por la posesión adversa de los mismos.

" 'De acuerdo con esta doctrina, aunque los terrenos cedidos a los Estados Unidos y adquiridos más tarde por el Pueblo de Puerto Rico, estuvieran sujetos a prescripción bajo las leyes en vigor anteriormente, no obstante, si al efectuarse el cambio de Soberanía el dominio no se había consolidado en el poseedor, la prescripción quedó interrumpida, no pudiendo invocarse hoy en contra de la parte demandante.

" 'La prescripción como dice muy bien el Sr. Manresa, en sus comentarios al Código Civil Español, no es un derecho creado o adquirido ya, sino una mera espectativa, una esperanza, cuyo cumplimiento o realización depende de una multitud de eventualidades; y como no es un derecho adquirido, no puede estimarse sujeta su realización a la legislación que antes rigiera, y bajo cuyo imperio quedara perfeccionado dicho derecho, o el acto jurídico de que tuviera origen, o al que debiera su nacimiento.

" 'En virtud del cambio de Soberanía, consumado al firmarse el Tratado de Paz, se operó un cambio fundamental en las leyes políticas de este país, e *ipso facto* quedaron completamente derogadas todas las leyes de origen político, así como aquéllas que dependían de la voluntad del Soberano, tales como la disposición y gobierno de la propiedad pública.

" 'Es una doctrina firmemente establecida que cuando una Soberanía cede a otra algún territorio, las leyes de la primera autorizando la enajenación de la propiedad pública y la autoridad de los funcio-

narios encargados de llevarla a efecto, quedan completamente derogadas. (*More* v. *Steinbach,* 127 U. S. 70, 81; *Ely's Adm'r.* v. *United States,* 171 U. S. 220, 230; *United States* v. *Vallejo,* 1 Black 541; *Harcourt* v. *Gaillard,* 12 Wheat 523.)

" 'De acuerdo con esta doctrina, los terrenos cedidos por la nación española a los Estados Unidos, deben gobernarse y regularse por las leyes de este país y no por las leyes de la nación cedente.'
(Opinión del Juez sentenciador, Sr. Córdova Dávila, págs. 36, 37 y 38 de la transcripción.) ''

Mas eso se dijo en relación con el Pueblo de Puerto Rico, entidad soberana, no en relación con los municipios. Con respecto a éstos la regla aplicable se fijó en el caso de *Logan County* v. *City of Lincoln,* 81 Ill. 156, 158, como sigue:

"Nuestra interpretación de la ley es que, en relación con todos los derechos de carácter público, con respecto a la propiedad poseída para uso público, o por virtud de fideicomiso, las corporaciones municipales no están sujetas a los estatutos de limitación (prescripción); pero en relación con los contratos o meros derechos privados, la regla es diferente, y tales corporaciones, al igual que los ciudadanos particulares, pueden alegar o tienen que sufrir que se alegue contra ellas, la prescripción.''

Y con mayor extensión y más amplio y convincente razonamiento por la Corte Suprema de los Estados Unidos en el caso de *Metropolitan R'D* v. *Dist. of Columbia,* 132 U. S. 1. Hablando por la corte el Juez Sr. Bradley se expresó, en parte, como sigue:

"Alega el apelante que él (el Distrito de Columbia) no se halla sujeto al 'Estatuto de Limitaciones' (prescripción) por tres razones: primero, por la dignidad con que se halla investido por participar del poder soberano del gobierno; segundo, porque él no está incluído dentro de los términos del estatuto de limitaciones en vigor en el Distrito; y tercero, porque asumiendo que las palabras generales del estatuto sean lo suficientemente amplias para incluir al Distrito, sin embargo, las corporaciones municipales no están sujetas a las disposiciones del estatuto a menos que sean especialmente mencionadas.

"1. La primera cuestión a decidir será, por consiguiente, si el Distrito de Columbia es o no un mero cuerpo municipal, o si posee

tal carácter soberano o se halla en tal forma identificado con o es representativo de la soberanía de los Estados Unidos que puede invocar las prerrogativas y exenciones de la soberanía.''

Examina entonces el gobierno del distrito y los cambios que tuvieron lugar desde su organización y continúa:

''Somos claramente de opinión que el demandante es una corporación municipal, con derecho a demandar y ser demandada, y sujeta a las reglas ordinarias que gobiernan la ley de procedimientos entre particulares.

''2. Pero la Corte Suprema del Distrito supone que las corporaciones municipales no están comprendidas en las palabras del estatuto de limitaciones. Veamos si es posible sostener ese criterio.

''El estatuto en vigor en el Distrito es el de Maryland, aprobado en 1715, c. 23. La ley, en cuanto concierne a las acciones personales, es fundamentalmente igual a la de 21 James I. Comienza con el siguiente preámbulo: 'Por cuanto, nada puede resultar más esencial a la paz y tranquilidad de esta provincia que la estabilización de los títulos de la propiedad de sus habitantes, para cuya realización no puede adoptarse mejor medida que limitar el tiempo para el comienzo de acciones semejantes a aquéllas que son juzgadas en las cortes de esta provincia, desde el momento que surge la causa de acción. Se resuelve por tanto que todas las acciones de....deberán ser comenzadas dentro de....'

''Las corporaciones son 'personas' en derecho. No existe razón aparente por la cual no deban ser incluídas en el estatuto. Se admite que las corporaciones privadas están incluídas. ¿Por qué entonces las corporaciones municipales ser excluídas? Ciertamente que no será basado en que ellas no son 'personas', pues eso excluiría a las corporaciones privadas. Se hallan por consiguiente, dentro de los términos de la ley.

''3. ¿No caen igualmente dentro del espíritu y razón de la ley? Están ciertamente dentro de la razón del preámbulo. Tanto concierne a los intereses y tranquilidad públicos el que se limite a las corporaciones municipales el tiempo para instituir acciones como a los individuos o corporaciones privadas. La razón aducida en el preámbulo como fundamento para la aprobación de la ley, se aplica a todos; y además, demuestra que los fines de la ley son beneficiosos, y que por lo tanto, deben ser liberalmente interpretados. No puede desde luego, ser aplicable al poder soberano. Ninguna ley de carácter restrictivo se aplica al soberano, salvo que así se disponga expresa-

mente. Y especialmente ninguna ley que afecte un derecho basada en negligencia o 'laches', porque la negligencia y 'laches' no pueden ser imputadas al soberano. Y no importa que el soberano sea un monarca individual, una república o un estado. El principio se aplica a todo soberano. La razón usualmente aducida para explicar esta prerrogativa es que el soberano no responde de la desidia de sus agentes. Pero, sea cual fuere la verdadera razón, tal es la ley general—la ley universal, salvo que expresamente se renuncie a ella. El privilegio sin embargo, envuelve una prerrogativa y no puede ser invocado por ninguna persona inferior al soberano, ya sea esa persona natural o corporativa.

"A duras penas resulta necesario el discutir con más amplitud la cuestión de la aplicabilidad del estatuto de limitaciones a una corporación puramente municipal, cuando ésta se encuentra comprendida dentro de los términos generales de la ley. Se decidió expresamente que era aplicable en los casos de *Kennebunkport* v. *Smith,* 22 Maine 445; *Cincinnati* v. *First Presbyterian Church,* 8 Ohio 298; *Cincinnati* v. *Evans,* 5 Ohio St. 594; St. *Charles County* v. *Powell,* 22 Missouri 525; *Armstrong* v. *Dalton,* 4 Devereux, (Law) 568; y en otros casos citados en las monografías que aparecen en Wood on Limitations, Sec. 53; 2 Dillon on Municipal Corporations, Secs. 668, 3ª. ed. El Juez Dillon, en la sección citada de su obra, dice muy acertadamente:

" 'Es bien clara la doctrina de que la máxima, *"nullum tempus occurrit regi,"* es de aplicación al poder soberano y que los Estados Unidos y los varios Estados no están, salvo un pronunciamiento expreso, en contrario, sujetos a las disposiciones del estatuto de limitaciones. Si bien se considera a las corporaciones municipales como agencias públicas, que ejercitan, a nombre del estado, funciones públicas, hay sin embargo muchos casos que sostienen que tales corporaciones no están exentas de la aplicación de los estatutos de limitaciones y que por el contrario, tales estatutos, al menos con respecto a toda acción real o personal, se aplica tanto en favor o en contra de estas corporaciones en igual forma y extensión que contra las personas naturales.'

. . . . . . . . .

"No es necesario determinar cuál puede ser la regla con respecto a usurpaciones de terrenos y estorbos públicos surgidos como consecuencia de intrusiones (*encroachments*) en las carreteras y otros sitios públicos. Son éstas generalmente ofensas contra el poder soberano mismo, y como tales, ningún período de tiempo puede protegerlas. Cuando el derecho de propiedad en tales sitios está inves-

tido en la municipalidad, la reclamación de tal derecho puede estar o no sujeta a la ley de prescripción. No expresamos opinión sobre este punto, ya que el mismo puede ser afectado por consideraciones que no están envueltas en el presente caso.''

Aplicando la regla del modo más amplio, esto es, tomando en cuenta la diferencia reconocida por la Corte Suprema de Illinois y por Dillon e insinuada en el párrafo final de la parte de la opinión de la Corte Suprema Federal que dejamos transcrita, aún así no quedaría comprendido este caso entre los no prescriptibles, por no tratarse de un bien de uso público.

Como pauta a seguir puede tomarse la fijada por el Código Civil, ed. 1930, en sus artículos 255, 256 y 257. Según ellos son bienes de dominio público, los destinados al uso público, como caminos, canales, ríos, torrentes, y otros análogos, y están destinados al uso público en Puerto Rico y en sus pueblos los caminos insulares y los vecinales, las plazas, calles, fuentes y aguas públicas, los paseos y las obras públicas de servicio general, costeadas por los mismos pueblos o con fondos del tesoro de Puerto Rico.

Todos los demás que los municipios posean, se declaran patrimoniales, esto es, bienes de propiedad privada, prescribiéndose que se regirán por las disposiciones del Código, entre las cuales se encuentran las relativas a la prescripción.

El bien de que aquí se trata por más que en verdad pudiera considerarse como una obra de arte adquirida y preservada por el municipio para beneficio del público, no está comprendida entre las especificadas por la ley como de dominio o uso público, ni es a ellas análoga. Por lo menos ni la parte apelante ha citado ni hemos podido nosotros encontrar entre los precedentes españoles y americanos que hemos consultado nada que nos permita llegar a una conclusión contraria.

Eso resuelto claro es que debemos resolver también que el segundo y último de los errores señalados, el relativo a la aplicación al caso de la ley de prescripción, tampoco fué

cometido y que *procede en su consecuencia la desestimación del recurso y la confirmación de la sentencia apelada.*

El Juez Asociado Sr. Wolf está conforme con la sentencia y con la primera parte de la opinión. En cuanto a la segunda está también conforme pero en algo por otras razones.[*]