José Raúl Pagán Torres, demandante, *v.* Secretario de Recursos Naturales, Pedro Negrón Ramos y Otros, demandados.

*Número:* O-77-18          *Resuelto:* 10 de mayo de 1977

*Justo Gorbea Varona, Procurador General Interino,* y *Mario L. Paniagua, Procurador General Auxiliar,* abogados del Secretario de Recursos Naturales; *Oswald Evan Perkins,* abogado de la parte demandante.

EL JUEZ ASOCIADO SEÑOR DÍAZ CRUZ emitió la opinión del Tribunal.

Varios agricultores de los municipios de Adjuntas y Utuado han instado acción en la Corte de Distrito de los Estados Unidos para Puerto Rico reclamando protección constitucional para su alegado derecho de propiedad sobre yacimientos minerales en el subsuelo de fincas que poseen o cuya superficie enajenaron, fundando su derecho en disposiciones del Código Civil de Puerto Rico, el Tratado de Paz entre Estados Unidos y España, la Carta Orgánica de 1900 (Ley Foraker) y la legislación de minería de España y de Puerto Rico. Por estar planteada una cuestión de derecho puertorriqueño sobre la que no existen precedentes claros en la jurisprudencia de este Tribunal, la Corte Federal, en orden a la Regla 53.4 de Procedimiento Civil nos ha certificado para determinación la siguiente cuestión de derecho:

"Si a tenor de las leyes del E.L.A. el derecho privado de dominio sobre inmuebles incluye un derecho de propiedad en minerales yacentes en el interior de la tierra afectados por la aprobación del Art. I[A] de la Ley de Minas de Puerto Rico. (28 L.P.R.A. sec. 111 y ss.)"

Las partes han presentado alegatos ante este Tribunal de conformidad con la Regla 27 de nuestro Reglamento, y procedemos a resolver.

Al firmarse el Tratado de Paz de París el 10 de diciembre de 1898 entre los Estados Unidos de América y el Reino de España, Puerto Rico no era "muchedumbre sin consejo público", sin cuerpo alguno de ciudad, ni senado, ni consejo de la plebe ni magistrado.[1] Era un pueblo constituido en comunidad de derecho con cierto grado de personalidad interna-

---

[1] Hugo Grocio, *Del Derecho de la Guerra y de la Paz,* Tomo 2, pág. 148, versión española por Torrubiano Ripoll, Ed. Reus (1925).

cional, aun cuando de soberanía imperfecta, dimanante de la Carta Autonómica de 1897, (²) integrado con los elementos que identifican el Estado o persona del derecho internacional: 1°, había un pueblo en número suficiente para perpetuarse. Un pueblo es un conjunto de individuos de ambos sexos que viven juntos en comunidad, a pesar de que puedan pertenecer a diferentes razas o credos y ser de color diferente; 2°, existía un territorio en el que se había asentado el pueblo; 3°, existía un gobierno organizado que ejercía control del territorio y administraba la justicia con arreglo a la ley del país; 4°, había un grado de capacidad para entrar en relaciones con el mundo exterior en la negociación de tratados de comercio; y 5°, los habitantes de Puerto Rico habían alcanzado un nivel de civilización que les capacitaba, en lo que respecta a las naciones del mundo, para honrar los principios de Derecho que rigen los miembros de la sociedad internacional. Hyde, *International Law*, Vol. 1, págs. 22 y 147, Segunda Edición (1951); Oppenheim, *Tratado de Derecho Internacional Público*, Tomo 1, Vol. 1—Paz—Octava Edición (1961), págs. 126–127. Mediante la Carta Orgánica (Acta Foraker) de 12 de abril de 1900, el Congreso de los Estados Unidos proveyó un gobierno civil para Puerto Rico, creando un cuerpo político bajo el nombre de "El Pueblo de Puerto Rico" (sec. 7); declaró en la Sec. 13 como bienes públicos "todas las propiedades que puedan haber adquirido en Puerto Rico los Estados Unidos por la cesión de España en dicho Tratado de Paz, [³] en . . . minas o minerales bajo la superficie de terrenos particulares", las que puso "bajo la dirección del Gobierno establecido por

---

(²) No obstante su condición de persona emergente en el plano internacional y la garantía inserta en el Real Decreto de que una vez aprobada la Constitución para las Islas de Cuba y Puerto Rico "no podrá modificarse sino en virtud de una ley y a petición del Parlamento insular", Puerto Rico no fue parte en el Tratado de París. Carta Autonómica de 1897, Art. 2° de los Adicionales.

(³) Según el texto del Art. VIII del Tratado de París de 1898, "España renuncia en Cuba y cede en Puerto Rico . . . todos los edificios, muelles, cuarteles, fortalezas, establecimientos, vías públicas y demás bienes inmue-

esta Ley [Foraker], para ser administrados a beneficio de El Pueblo de Puerto Rico;" y dispuso el Congreso que "la Asamblea Legislativa creada por la presente, tendrá autoridad para legislar respecto a todos estos asuntos, según lo estimare conveniente, con sujeción a las limitaciones impuestas a todos sus actos." 31 Stat. 80; Tomo 1 L.P.R.A. págs. 35–36.

Dispuso el Acta Foraker en su Sec. 8 "Que las leyes y ordenanzas de Puerto Rico actualmente en vigor, [4] continuarán vigentes, excepto en los casos en que sean alteradas, enmendadas o modificadas por la presente; o hayan sido alteradas o modificadas por órdenes militares y decretos vigentes cuando esta Ley entre a regir, y en todo aquello en que las mismas no resulten incompatibles, o en conflicto con las leyes estatutarias de los Estados Unidos no inaplicables localmente, o con las presentes disposiciones, hasta que sean alteradas, enmendadas o revocadas por la autoridad legislativa creada por la presente para Puerto Rico, o por una ley del Congreso

---

bles que con arreglo a derecho son del dominio público, y como tal corresponden a la Corona de España." Declaraba el Art. 339 del Código Civil Español:

"Son bienes de dominio público:

"1o Los destinados al uso público, como los caminos, canales, ríos, torrentes, puertos, y puentes construidos por el Estado, las riberas, playas, radas y otros análogos.

"2o Los que pertenecen privativamente al Estado, sin ser de uso común, y están destinados a algún servicio público o al fomento de la riqueza nacional, como las murallas, fortalezas y demás obras de defensa del territorio y las minas, mientras que no se otorgue su concesión."

Cf. *El Pueblo* v. *Dimas et al.,* 18 D.P.R. 1061, 1072 (1912).

(4) Es regla general de derecho público que en cambios de soberanía de una nación a otra las leyes municipales del país, las que tienen por objeto protección de derechos privados, continúan vigentes hasta que . . . por *acción expresa* del nuevo gobierno sean alteradas o derogadas. *Chicago, Rock Island R.R. Co.* v. *McGlinn,* 114 U.S. 546 (1885); *Ex Parte Bird,* 5 D.P.R. 247, 251 y ss. (1904); *Marimón* contra *Pelegri,* 2 D.P.R. 331, 342 (1902).

Por Orden General Núm. 1 de 18 de octubre de 1898 expedida por el Gobernador Militar norteamericano se dispuso que las leyes provinciales y municipales, hasta donde afectaren la determinación de derechos privados

de los Estados Unidos." 31 Stat. 79; Tomo 1 L.P.R.A. pág. 32.

Al inaugurarse el régimen estatuido por el Acta Foraker regía en Puerto Rico la Ley de Minas Española de 4 de marzo, 1868 predicada en el principio de que la propiedad de las minas corresponde al Estado, y bajo el mismo no se otorga a los particulares más consideración que la de *concesionarios*, y nunca la de propietarios. Declaraba en sus artículos iniciales:

"Artículo 1.° Son objeto especial del ramo de minería todas las sustancias inorgánicas, metalíferas, combustibles o salinas, los fosfatos calizos, la baritina, espato fluor y las piedras preciosas, ya se presenten en filones, ya en capas o cualquier otra forma de yacimiento, con tal que exija su disfrute un ordenado laboreo, bien sea este superficial o subterráneo.

Artículo 2.° La propiedad de las sustancias designadas en el artículo anterior corresponde al Estado, y nadie podrá disponer de ellas sin concesión del Gobierno, otorgada en su nombre por los Gobernadores de las provincias."

En concordancia con dicha Ley especial regía el Art. 339 del Código Civil Español que ordenaba: *Son bienes de dominio público:*

".        .        .        .        .        .        .        .

2.° Los que pertenecen privativamente al Estado, sin ser de uso común, y están destinados a algún servicio público o al fomento de la riqueza nacional, como las murallas . . . fortalezas y demás obras de defensa del territorio . . . y las minas, mientras que no se otorgue su concesión."

También regían los Arts. 426, 427 y 478 del Código Civil Español que ordenaban:

"Art. 426 Todo español o extranjero podrá hacer libremente en terreno de dominio público calicatas o excavaciones que no

---

correspondientes a individuos o propiedades ". . . serían mantenidas en todo su vigor a menos que resultasen incompatibles con el cambio de condiciones realizado en Puerto Rico. A pesar de hacer reconocimiento expreso de este principio, el Congreso de los Estados Unidos siempre ha calificado las minas de Puerto Rico como 'bien público'. "

excedan de diez metros de extensión en longitud o profundidad con objeto de descubrir minerales; pero deberá dar aviso previamente a la Autoridad local. En terrenos de propiedad privada no se podrán abrir calicatas sin que preceda permiso del dueño o del que le represente.

Art. 427 Los límites del derecho mencionado en el artículo anterior, las formalidades previas y condiciones para su ejercicio, la designación de las materias que deben considerarse como minerales y la determinación de los derechos que corresponden al dueño del suelo y a los descubridores de los minerales en el caso de concesión, se regirán por la Ley especial de Minería.

Art. 478 La calidad de usufructuario no priva al que la tiene del derecho que a todos concede la Ley de Minas para denunciar y obtener la concesión de las que existan en los predios usufructuados, en la forma y condiciones que la misma Ley establece."

Estos artículos se limitaban a proclamar el principio de las investigaciones de los minerales, remitiendo para el ejercicio de este derecho, la determinación de los minerales y los derechos de propiedad y explotación sobre ellos, a la Ley especial de Minería. Bonet y Ramón, *Código Civil Comentado*, pág. 379, 2da. Ed. 1964.

▌ De este esquema jurídico hasta aquí delineado se proyecta con infundible claridad que las minas yacentes en todo el subsuelo del territorio nacional de Puerto Rico eran parte de su patrimonio, de la riqueza colectiva y común de todos sus habitantes, y que el Acta Foraker ordenó al Gobierno de Puerto Rico preservar para beneficio de este pueblo. El Art. 339 del Código Civil Español destacaba las minas, mientras no se otorgaran en concesión, como bienes de dominio público, pertenecientes privativamente al Estado y destinadas al fomento de la riqueza nacional. Los recursos minerales de Puerto Rico, en virtud del derecho civil común de España, fueron investidos con el carácter de patrimonio nacional inalienable de este país, [5] ya políticamente definido desde 1897 como pueblo autónomo bajo un régimen constitucional.

---

[5] XI "Tampoco el patrimonio, cuyos frutos son destinados para sustentar las cargas de la república o de la dignidad real, puede ser enajenado

Fue en cumplimiento del citado mandato de la Ley Foraker que en 1902 se aprobó por la Asamblea Legislativa de Puerto Rico el Art. 5 del Código Político declarando: "El derecho primitivo y final a todos los bienes inmuebles y muebles, dentro de los límites de Puerto Rico, y no pertenecientes a los Estados Unidos, reside en el pueblo de dicho territorio." 1 L.P.R.A. sec. 2.

El Congreso ha sido consecuente en una política pública de dejar los recursos de minería, no en manos particulares, sino en poder del Pueblo de Puerto Rico. Su determinación de continuar el régimen económico español en materia de minería, fundada en que la conveniencia social exige la subordinación de los intereses privados a los intereses generales y colectivos, constituyó una singular y temprana captación de las necesidades de desarrollo de un país de reducida extensión geográfica, limitado en sus recursos naturales, así como el reconocimiento del principio económico-social de que dentro de estas circunstancias de realidad puertorriqueña la explotación de minas por pequeños propietarios dueños de minifundios conduce a la anarquía improductiva. [6] Dicha política

por los reyes ni en todo ni en parte. Pues tampoco en esto tienen mayor derecho que el fructuario. Ni admito la excepción de si la cosa vale poco, porque lo que no es mío no tengo derecho a enajenarlo ni en mínima parte. . . ." Hugo Grocio, *Del Derecho de la Guerra y de la Paz*, Tomo 2, pág. 74, Ed. Reus (1925).

Por dominio particular del Estado "entiende el que a éste compete sobre aquellas cosas destinadas a su servicio, o sea, a la satisfacción de sus necesidades colectivas, *y no al uso común*, cosas de las que dispone como los particulares de las que constituyen su patrimonio: tales son, entre otras muchas, los montes, *minas*, arsenales, fortalezas y edificios militares." *Rubert Armstrong* v. *E.L.A.*, 97 D.P.R. 588, 620 (1969).

[6] Este principio de utilidad pública que Castán identifica como limitaciones de la propiedad por el Derecho Público (Castán Tobeñas, *Derecho Civil Español, Común y Foral*, Tomo 2, Vol. 1, pág. 161 y ss., Ed. 10ª (1971)) ha sido objeto de notable síntesis por el Prof. Guaroa Velázquez al comentar:

"De atenernos sólo al artículo 284 [31 L.P.R.A. sec. 1115] parecería que el propietario de la superficie es igualmente propietario de los yacimientos mineros situados en el subsuelo del fundo. Tal era la solución que imperaba en una época en todos los países, a todas luces incompatible con

pública del Congreso se manifiesta con invariable consistencia en el Art. 13 ([7]) de la Carta Orgánica de 1900 (Bill Foraker) ; en el Art. 7 de la Carta Orgánica ([8]) de 1917 (Bill Jones) y en la Ley Pública 600 de 3 de julio de 1950, que dejó en vigor dicho Art. 7 del Acta Jones incorporado como Sec. 7

---

el interés general. Es una verdad enseñada por la experiencia, que la explotación de las minas, para hacerse fructuosamente y con seguridad suficiente para los obreros, exige capitales considerables. Además, su explotación no puede soportar, sin grave daño, la partición resultante de la división de la propiedad del suelo. Por otra parte, conviene al Estado que las minas sean explotadas en condiciones ventajosas. En efecto, la riqueza minera de un país constituye uno de sus principales recursos, indispensable a la prosperidad de su industria, y, con frecuencia, asimismo, a la defensa nacional. El derecho superior de la colectividad no es, pues, en este caso, conciliable con las consecuencias lógicas extremas del concepto de la propiedad individual. De ahí que se promulgara en España la Ley de Minas del 6 de julio de 1859, reformada por la del 4 de mayo de 1866, la que ha sido adoptada en Puerto Rico por ley de 18 de agosto de 1933. Tal disposición aporta una atemperación substancial al artículo 284 del Código Civil." *Los Derechos Reales Principales*, págs. 82-83, Ed. 1937.

([7]) Art. 13. *Bienes públicos*.

"Que todas las propiedades que puedan haber adquirido en Puerto Rico los Estados Unidos por la cesión de España en dicho Tratado de Paz, en puentes públicos, casas camineras, fuerza motriz de agua, carreteras, corrientes no navegables, y los lechos de las mismas, aguas subterráneas, minas o minerales bajo la superficie de terrenos particulares, y toda propiedad que al tiempo de la cesión pertenecía, bajo las leyes de España entonces en vigor, a las varias Juntas de Obras de Puertos de Puerto Rico, y todas las orillas de los puertos, muelles, embarcaderos y terrenos saneados, pero sin incluir la superficie de los puertos o aguas navegables, por la presente quedan bajo la dirección del Gobierno establecido por esta Ley, para ser administrados a beneficio de El Pueblo de Puerto Rico; y la Asamblea Legislativa creada por la presente, tendrá autoridad para legislar respecto a todos esos asuntos, según lo estimare conveniente, con sujeción a las limitaciones impuestas a todos sus actos." 31 Stat. 80; Tomo 1 L.P.R.A. págs. 35-36.

([8]) Art. 7. *Bienes Públicos; traspasos entre los Estados Unidos y Puerto Rico*.

"Toda propiedad que hubiere sido adquirida en Puerto Rico por los Estados Unidos, en virtud de la cesión hecha por España en el tratado de paz celebrado el día 10 de diciembre de 1898, en puentes públicos, casas camineras, fuerza motriz de agua, carreteras, corrientes no navegables y lechos de las mismas, aguas subterráneas, minas o minerales bajo la superficie de terrenos particulares; toda propiedad que al tiempo de la cesión pertenecía, en virtud de las leyes de España entonces en vigor, a las dife-

de la Ley de Relaciones Federales. (⁹) Este curso de acción seguido por el Congreso ha sido reconocido en nuestra jurisprudencia. Ha dictaminado este Tribunal: "Perteneciendo, pues, las tierras en disputa a la Corona de España, si ésta no se había desprendido válidamente de ellas el 10 de diciembre de 1898 en que se firmó el Tratado de París, es indudable que con arreglo al Art. VIII del Tratado, su propiedad pasó a los Estados Unidos de América. La política seguida por el Congreso de los Estados Unidos con respecto a los bienes públicos adquiridos por la nación americana de la nación española en la Isla de Puerto Rico, ha sido la de ceder a ésta todos los dichos bienes, con excepción de aquellos que por su naturaleza corresponden al dominio nacional y de los expresamente reservados para fines nacionales. Ni en los unos, ni en los otros se encuentran comprendidos los terrenos de que se trata en este pleito. Si algún título, pues, adquirieron sobre ellos Estados Unidos, dicho título pasó a El Pueblo de Puerto Rico." *El Pueblo* v. *Municipio de San Juan*, 19 D.P.R. 656, 661–62 (1913). A igual conclusión ha llegado la Corte Federal (¹⁰) en Puerto Rico.

---

rentes juntas de obras de puertos de Puerto Rico; todas las orillas de los puertos, muelles, embarcaderos, terrenos saneados y todos los terrenos y edificios públicos no reservados hasta ahora por los Estados Unidos para fines públicos, quedan por la presente bajo el dominio del Gobierno de Puerto Rico, para ser administrados a beneficio del Pueblo de Puerto Rico y la Asamblea Legislativa de Puerto Rico tendrá autoridad, con sujeción a las limitaciones impuestas a todas sus leyes, para legislar respecto a todos esos asuntos según lo estimare conveniente . . . ." 39 Stat. 954; Tomo 1 L.P.R.A. pág. 85.

(⁹) 64 Stat. 319; Tomo 1 L.P.R.A. pág. 200.

(¹⁰) En el caso de *Ligia C. Brady* v. *United States Government et als.*, Civil Núm. 74-357, el 13 de junio de 1974 su Juez Presidente Sr. José V. Toledo dictó la siguiente resolución:

"Title to mineral deposits within Puerto Rico has always been a part of public domain; the transfer by treaty of said title from one sovereign to another and leading to passage of the present law of mines, Title 28, Laws of Puerto Rico Annotated, Section 111 (1933), wherein title is vested in the Commonwealth of Puerto Rico was, therefore, never violative of plaintiff's constitutional rights. Furthermore, the Law of Mines, Section 115(1), Paragraph 4, subjects condemnation proceedings to the General

La contención de los demandantes respecto a ser dueños exclusivos de los depósitos minerales en las tierras que retienen o enajenaron descansa en una actuación confusa de la Asamblea Legislativa de Puerto Rico en 1902 cuando al aprobar el Código Civil suprimió los Arts. 426, 427 y 478 del Código Civil Español (ante), substituyó el Art. 350 de éste [11] por el que es hoy Art. 284 (31 L.P.R.A. sec. 1115) que dispone:

"El propietario de un terreno es dueño de su superficie y de lo que está debajo de ella y puede hacer en él las obras, plantaciones y excavaciones que le convengan, salvo las servidumbres legalmente establecidas";

y enmendó el Art. 478 del Código Civil Español, [12], hoy 407 (31 L.P.R.A. sec. 1518) que dice:

"La calidad de usufructuario no priva al dueño del terreno del derecho de propiedad que le corresponda en los minerales de todo género que existan en el subsuelo."

---

Law of Eminent Domain considered an attribute of sovereignty. *Green St. Ass'n* v. *Daley*, 373 F.2d 1, cert. denied 87 S.Ct. 2054. Accordingly, plaintiff's motion for convening of a three judge court is hereby denied for lack of substantiality and the case is hereby dismissed.

IT IS SO ORDERED."

Desde el año 1904 hay una posición doctrinaria de este Tribunal Supremo cuando al aceptar los fundamentos de derecho de la sentencia apelada, incorporó en su opinión un "Considerando" del Tribunal de Distrito de San Juan en que se sostiene "que el derecho positivo vigente de minería está basado en el sistema de dominio eminente del Estado, limitado por la concesión que se hace al superficiario, de las sustancias minerales adheridas al suelo . . . ." *Del Toro* v. *El Pueblo*, 7 D.P.R. 517, 522 (1904).

[11] Art. 350, Código Civil Español

"El propietario de un terreno es dueño de su superficie y de lo que está debajo de ella, y puede hacer en él las obras, plantaciones y excavaciones que le convengan, salvas las servidumbres, y con sujeción a lo dispuesto en las Leyes sobre minas y aguas y en los Reglamentos de policía."

[12] Art. 478, Código Civil Español

"La calidad de usufructuario no priva al que la tiene del derecho que a todos concede la Ley de Minas para denunciar y obtener la concesión de las que existan en los predios usufructuados, en la forma y condiciones que la misma Ley establece."

■ Sin embargo, la Asamblea Legislativa nunca derogó ni enmendó la entonces vigente Ley de Minas Española de 4 de marzo de 1868 reformando la de Minas de 6 de julio de 1859 ([13]) (Colección Legislativa de España, Tomo 99, pág. 1044 (Ed. 1868)), y toda vez que dicha legislación especial de minería de España no era incompatible sino acorde con la política pública sobre dichos recursos minerales inaugurada por el régimen norteamericano en Puerto Rico, quedó amparada en su vigencia por la Orden General Núm. 1 de 18 de octubre de 1898, en la que el Gobernador Militar dispuso que las leyes provinciales y municipales, hasta donde afectaren la determinación de derechos privados correspondientes a individuos o propiedades y la sanción por la comisión de delitos criminales, serían mantenidas en todo su vigor, a menos que resultasen incompatibles con el cambio de condiciones realizado en Puerto Rico, y que dichas leyes serían administradas sustancialmente tal como existían antes de la cesión a los Estados Unidos. Historial del Código Civil, 31 L.P.R.A. sec. 1. Como antes hemos indicado, no eran los artículos del Código Civil derogados en 1902, sino la ley especial de minería la que determina los minerales y los derechos de propiedad y explotación sobre los mismos, incluyendo las servidumbres legales que los viabilizan, que por ser de carácter administrativo, necesariamente remiten para la aplicación a ellas del derecho positivo, a las leyes y reglamentos especiales como fuente de derecho principal o de primer grado, y al Código Civil como derecho supletorio. Art. 486 ([14]) del Código Civil (31 L.P.R.A. sec. 1702); Manresa, *Comentarios al Código Civil Español*,

---

([13]) La Ley de Minas de 1859 se hizo extensiva a Puerto Rico por Real Orden de 13 de octubre de 1863 dirigida al Gobernador Superior Civil de Puerto Rico. Joaquín Rodríguez San Pedro, *Legislación Ultramarina*, Tomo 5, pág. 105, Ed. 1866.

([14]) Intocado por la Legislatura de 1902 que lo incorporó al Código Civil de ese año con el Núm. 557 (igual al Art. 550 Esp.) ordena este Art. 486:

"Todo lo concerniente a las servidumbres establecidas para utilidad pública o comunal se regirá por las leyes y reglamentos especiales que las

Tomo 4, pág. 834, Séptima Edición (1972); Castán Tobeñas, *opus cit.* Tomo 2, Vol. 2, págs. 109–110, Edición Décima (1965); Scaevola, *Código Civil*, Tomo 10, págs. 520–521, Quinta Edición (1947). Además de dejar intocada en toda su integridad la Ley de Minas Española, la Asamblea Legislativa de 1902 aprobó el Art. 5 del Código Político (hoy 1 L.P.R.A. sec. 2) *supra*, reservando para el pueblo de dicho territorio el derecho primitivo y final a todos los bienes inmuebles y muebles, dentro de los límites de Puerto Rico, y no pertenecientes a los Estados Unidos.

■ Resulta claro de estos antecedentes legislativos que la aprobación por la Asamblea Legislativa del Código Civil de 1902 y la presentación al Congreso[15] de los Estados Unidos del Informe de la Comisión Revisora de las Leyes de Puerto Rico, según provisto por la Sec. 40 de la Carta Orgánica de 1900, en nada varió la política pública de mantener los recursos minerales de Puerto Rico como propiedad del cuerpo político organizado como "Pueblo de Puerto Rico" y administrados para su beneficio. Cedidas nuestras minas por España a los Estados Unidos en virtud del Art. VIII del Tratado de París y transferidas éstas por el Congreso al Pueblo de Puerto Rico, su Asamblea Legislativa carecía de facultad alguna para donar este patrimonio del Estado, y no invocan los demandantes otra fuente de derecho que tal donación, pues ¿qué otro carácter tiene la inocua y súbita declaración del Art. 357 del Código Civil de 1902 de que "el propietario de un terreno es dueño de su superficie y de lo que está debajo de ella"? Recuérdese que el Congreso le encargó a la Asamblea Legislativa administrar esta riqueza pública, no regalarla. Art. 13, Acta Foraker. Ni las propiedades ni los fondos públicos pertene-

---

determinan, y en su defecto, por las disposiciones de la presente parte." 31 L.P.R.A. sec. 1702.

[15] No aparece que el Congreso tomara otra acción en relación con este Informe que la autorización para que se imprimieran copias del mismo. Resolución Conjunta de 7 de marzo de 1902 (32 Stat. Part 2, pág. 1765), Muñoz Morales, *Reseña Histórica y Anotaciones al Código Civil de Puerto*

cientes a un estado organizado pueden regalarse a personas particulares, ni utilizarse para fines privados. *Savings & Loan Assoc.* v. *Topeka*, 22 L.Ed. 455, 460–462 (1874); *Parkersburg* v. *Brown*, 27 L.Ed. 238, 244 (1882); *Ottawa* v. *Carey*, 27 L.Ed. 669, 674–675 (1882); *United States* v. *Butler*, 297 U.S. 1, 65–67 (1935); II Cooley, *Constitutional Limitations*, págs. 1026 y ss. y 1109; II Antieau, *Modern Constitutional Law*, sec. 12:58, págs. 309–310.

■ La legislación española sobre minas, por las razones antes dichas, no sufrió interrupción en su vigencia con el cambio de soberanía instaurado por el Tratado de París, integrándose con todo vigor a la política pública de los Estados Unidos en Puerto Rico y rigió el campo especial de la minería hasta la primera intervención con la misma por la Asamblea Legislativa mediante Ley Núm. 9 de 18 de agosto de 1933 titulada "para enmendar y reenactar la ley española de minas de 6 de julio de 1859, reformada por la de 4 de marzo de 1868", que en su artículo 1 (28 L.P.R.A. sec. 111) ratifica el principio de dominio público: la propiedad de las substancias del ramo de minería corresponde a El Pueblo de Puerto Rico. Este artículo ha sido renumerado como 1A y en su texto presente reitera que la propiedad de los minerales económicos que se encuentren en el suelo y el subsuelo de Puerto Rico corresponde al Estado Libre Asociado.

Ningún derecho tienen los demandantes a los yacimientos de minerales en las tierras que posean o hayan enajenado.

El Juez Asociado Señor Rigau no intervino.

---

*Rico*, Libro I, pág. 19, Ed. Universidad (1947). Sí consta una ratificación por el mismo 57º Congreso de su política de bienes públicos en Puerto Rico, cediendo al Gobierno de la Isla toda propiedad que allí tuvieran los Estados Unidos (con reserva de la necesaria para propósitos nacionales) para ser tenida y administrada para uso y beneficio del pueblo. 32 Stat. Part 1, pág. 731.